**In re: AIR CRASH OFF LONG ISLAND, NEW YORK, ON JULY 17, 1996.**

**Docket No. 98–9622.**

United States Court of Appeals, Second Circuit.

Argued Sept. 8, 1999.

Decided March 29, 2000.

Steven S. Bell, Seattle, WA (Perkins Coie LLP, Keith Gerrard, Jay S. Brown; Davis Weber & Edwards PC, New York, NY, George F. Hritz, Cynthia A. Feigin), for Defendant–Appellant The Boeing Company. Haight Gardner Holland & Knight, New York, NY, Randal R. Craft, Jr., William C. Brown III, Alan D. Reitzfeld, for Defendant–Appellant Trans World Air-

lines, Inc. Dombroff & Gilmore, Washington, DC, Mark A. Dombroff, Dane B. Jaques, of Counsel, for Defendant–Appellant Hydro–Aire, Inc.

Steven R. Pounian, New York, NY (Kreindler & Kreindler, Lee S. Kreindler, James P. Kreindler, Blanca I. Rodriguez, Jacqueline M. James; Speiser, Krause, Nolan & Granito, New York, NY, Frank H. Granito, Jr., Frank H. Granito, III; Baumeister & Samuels, New York, NY, Michel F. Baumeister; Nolan Law Group, Chicago, IL, Donald J. Nolan; Schaden, Katzman & Lampert, Broomfield, CO, Richard F. Schaden; Waite, Schneider, Bayless & Chesley, Cincinnati, OH, Jerome L. Skinner, of Counsel), for Plaintiffs' Committee.

Before: FEINBERG, CALABRESI, SOTOMAYOR, Circuit Judges.

FEINBERG, Circuit Judge.

Defendants Trans World Airlines, Inc., The Boeing Company, and Hydro–Aire, Inc., appeal from a decision of the United States District Court for the Southern District of New York, Robert W. Sweet, J., in June 1998 that denied their motion to dismiss plaintiffs' claims for nonpecuniary damages as barred under the Death on the High Seas Act, 46 U.S.C. app. §§ 761–767 (usually referred to hereafter as DOHSA). See *In re Air Crash Off Long Island, New York, on July 17, 1996*, 1998 WL 292333 (June 2, 1998). This appeal, which presents a question of first impression in this court, concerns whether DOHSA applies to an airplane crash in United States territorial waters roughly eight miles from the coast of the United States. For the reasons stated below, we agree with the district court that DOHSA does not apply to the crash.

## I. Background

The appeal arises out of the crash of TWA Flight 800, which departed from John F. Kennedy International Airport in New York on July 17, 1996, for Paris, France and Rome, Italy. Shortly after takeoff, the plane appears to have exploded in midair and crashed. According to the National Transportation Safety Board, the crash occurred approximately eight nautical miles [1] south of the shore of Long Island, New York. All 230 persons on board perished.

Plaintiffs are relatives and estate representatives of 213 passengers and crew members who died in the crash. Defendant Trans World Airlines owned and operated the aircraft. Defendant The Boeing Company manufactured the aircraft, and defendant Hydro–Aire, Inc., manufactured the aircraft's fuel pumps. In February 1997, the Judicial Panel on Multidistrict Litigation transferred to the Southern District of New York all wrongful death cases arising from the crash for consolidated pretrial proceedings. At the time the district court issued the decision under review, 145 cases had been consolidated before it.

In July 1997, defendants moved under Fed.R.Civ.P. 12(b)(6) to dismiss plaintiffs' claims for nonpecuniary damages. Defendants argued that DOHSA applies to this case and limits recovery to pecuniary damages. In June 1998, Judge Sweet denied defendants' motion in a written opinion, concluding that DOHSA applies only where death occurred on both the high seas and beyond a marine league [2] from shore, and that in this case the crash did not occur on the high seas. The judge reasoned that by using the term "high seas," Congress limited DOHSA's application to "non-sovereign waters," meaning "international waters not subject to the

---

1. One nautical mile equals approximately 1.15 land miles. This slight difference between the two has no effect on the decision in this case. Therefore, most references to mileage hereafter will ignore the difference.

2. A marine league is three nautical miles.

dominion of any single nation." Judge Sweet did not resolve the choice of law issues that remained once he had determined that DOHSA did not limit plaintiffs' damages. The judge certified his order for immediate appeal pursuant to 28 U.S.C. § 1292(b), and in December 1998, this court permitted defendants to take this interlocutory appeal.

## II. Discussion

The appeal primarily concerns the interpretation of § 1 of DOHSA, which provides for a right of action:

> Whenever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas beyond a marine league from the shore of any State, or the District of Columbia, or the Territories or dependencies of the United States. . . .

46 U.S.C. app. § 761. The parties agree that the crash occurred eight nautical miles off the coast of Long Island, which is "beyond a marine league from the shore of any State." However, the parties differ as to the meaning of "high seas." Plaintiffs argue that "high seas" refers to those waters beyond the territorial waters of the United States. Under Presidential Proclamation No. 5928, issued in 1988 by President Reagan, the territorial waters of the United States extend 12 miles from the shore of the United States.[3] As the crash occurred eight miles off the coast of Long Island, plaintiffs maintain it occurred in United States territorial waters, rather than on the high seas, and thus DOHSA

does not apply. Defendants contend that the term "high seas" means all waters beyond the low-water mark.[4] Defendants conclude that because the crash occurred both beyond the low-water mark and more than a marine league from the shore of Long Island, DOHSA applies. Our dissenting colleague advocates a third position, that "high seas" means all waters beyond a marine league from the shore. See dissent at 216, 223.

The question whether DOHSA applies is significant because § 2 of DOHSA limits recovery to "a fair and just compensation for the pecuniary loss sustained by the persons for whose benefit the suit is brought." 46 U.S.C. app. § 762. If DOHSA does not apply, however, plaintiffs claim they are entitled to nonpecuniary damages, e.g., for pre-death pain and suffering and survivor's grief.[5]

■ The district court's order is subject to de novo review because it resolved a motion to dismiss, see Stuto v. Fleishman, 164 F.3d 820, 824 (2d Cir.1999), and also because the key issue on appeal involves statutory construction, see United States v. General Dynamics Corp., 19 F.3d 770, 773 (2d Cir.1994) (citation omitted). In matters of statutory interpretation, the language of the statute "must ordinarily be regarded as conclusive." Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980). Where the statutory language is ambiguous, as the phrase "high seas" is in this case, our inquiry must range further. The Supreme Court has instructed,

---

**3.** On August 2, 1999, President Clinton extended the boundaries of the contiguous zone of the United States, a zone of waters "contiguous to the territorial sea of the United States," to 24 nautical miles. See Presidential Proclamation No. 7219, 64 Fed.Reg. 48,701 (Aug. 2, 1999). Because this crash predated President Clinton's Proclamation, we have no occasion to consider its effect.

**4.** The "low-water mark" is "the shoreline of a sea marking the edge of the water at the lowest point of the ordinary ebb tide." Black's Law Dictionary 1586 (7th ed.1999).

**5.** In his opinion certifying his order for immediate appeal, Judge Sweet noted that the effect of his order may be to allow plaintiffs to recover damages for loss of society, survivor's grief, pre-death pain and suffering, and punitive damages. See In re Air Crash off Long Island, New York, on July 17, 1996, 27 F.Supp.2d 431, 433 (S.D.N.Y.1998). We express no view as to the accuracy of this conclusion.

in a case involving the interpretation of a different section of DOHSA, that we must consider "the language of the Act as a whole, the legislative history of [the relevant provision], the congressional purposes underlying the Act, and the importance of uniformity of admiralty law." *Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 221, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986) (citation omitted). In *McDermott Int'l, Inc. v. Wilander,* 498 U.S. 337, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991), for example, the Supreme Court interpreted the word "seaman" in the Jones Act of 1920, the companion statute to DOHSA, with reference to the Supreme Court decisions to which Congress was responding when it passed the Jones Act. *See id.* at 341–42, 111 S.Ct. 807.

## A. Background of the Death on the High Seas Act

The Death on the High Seas Act provided a remedy for wrongful death at sea where none had clearly existed before. The federal courts initially recognized a right of action for wrongful death in general maritime law, based largely on humanitarian considerations: "[C]ertainly it better becomes the humane and liberal character of proceedings in admiralty to give than to withhold the remedy, when not required to withhold it by established and inflexible rules." *The Sea Gull,* 21 F. Cas. 909, 910 (C.C. Md. 1865) (No. 12,578) (Chase, C.J.). The Supreme Court took a more restrictive approach, however, in *The Harrisburg,* 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358 (1886). In that case, a steamer collided with a schooner in waters between the coast of Massachusetts and the islands of Martha's Vineyard and Nantucket, killing the first officer of the schooner. *See id.* at 199–200, 7 S.Ct. 140. Because the decedent's widow and child did not bring suit within the applicable state statutes of limitations, they sought to recover under general maritime law. The Supreme Court held that as there was no common-law remedy for wrongful death on land, there would be none at sea. *See id.* at 212–13, 7 S.Ct. 140. Plaintiffs were thus entitled to no relief in the absence of a statute. *See id.* at 213–14, 7 S.Ct. 140. *The Harrisburg* was ultimately overruled in *Moragne v. States Marine Lines, Inc.,* 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970), which established a remedy for wrongful death under general maritime law in a "meticulously reasoned" and "remarkably far-ranging" opinion by Justice Harlan for a unanimous Court.[6] *See* Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* 368 (2d ed.1975).

Judicial efforts to counteract the harshness of the rule of *The Harrisburg,* by expanding existing statutes to provide for recovery, complicated matters. *See Tallentire,* 477 U.S. at 212, 106 S.Ct. 2485 (citing cases), at 235, 106 S.Ct. 2485 (Powell, J., concurring in part and dissenting in part). The Supreme Court held in *The Hamilton,* 207 U.S. 398, 28 S.Ct. 133, 52 L.Ed. 264 (1907), for example, that one citizen of Delaware could bring suit in admiralty against another under Delaware's wrongful death statute, even though the death had occurred on the high seas, seven miles off the coast of Virginia.[7] Justice Holmes, writing for the Court, reasoned that Delaware law defined the obligations of the parties, "even when personally on the high seas." *Id.* at 403, 28 S.Ct. 133. Similarly, in *La Bourgogne,* 210 U.S.

---

**6.** The *Moragne* Court explained that *The Harrisburg* assumed, wrongly, that the United States followed British common law, under which there was no wrongful death action because the penalty for all intentional or negligent homicide was death and forfeiture of the felon's property to the Crown, leaving nothing to recover in a civil suit. *See* 398 U.S. at 382–84, 90 S.Ct. 1772. In any event, "the wholesale abandonment" of the prohibition on wrongful death actions in England and in the United States justified overruling *The Harrisburg. See id.* at 388, 90 S.Ct. 1772.

**7.** *See* George Whitelock, *A New Development in the Application of Extra–Territorial Law to Extra–Territorial Marine Torts,* 22 Harv. L.Rev. 403, 403 (1909).

95, 28 S.Ct. 664, 52 L.Ed. 973 (1908), the Court applied French law to an accident between French and British ships because the collision occurred on the high seas. *See id.* at 115, 28 S.Ct. 664. The tension between the logic of *The Harrisburg* and *The Hamilton* "created jurisdictional fictions and serious problems in choice of law that sometimes denied recovery altogether." *Tallentire*, 477 U.S. at 235, 106 S.Ct. 2485 (Powell, J., concurring in part and dissenting in part). Dismayed by these cases, the Maritime Law Association (MLA) began drafting the bill that became the Death on the High Seas Act. *See Whitelock*, supra, at 415–16; *see also* Robert M. Hughes, *Death Actions in Admiralty*, 31 Yale L.J. 115, 116–17 (1921).

## B. The Drafting of the Death on the High Seas Act

Congress initially sought to create a uniform remedy for wrongful death, but gradually refined the scope of DOHSA so as not to displace preexisting state remedies. Although the phrase "high seas" was rarely the focus of debate, the legislative history provides some indication of how that phrase should be interpreted to effectuate the purposes of DOHSA.

The first priority was to draft a statute allowing recovery for wrongful death on the high seas. Critics of *The Harrisburg* maintained that the rule of that case had been rejected by "(e)very country of western Europe," and was a "disgrace to a civilized people." H.R.Rep. No. 66–674, at 4 (1920); S.Rep. No. 66–216, at 4 (1919); *see also Moragne*, 398 U.S. at 397, 90 S.Ct. 1772 (citing criticism). The MLA drafted a bill that would achieve uniformity in maritime remedies, displacing the patchwork of state statutory remedies that raised difficult choice of law issues. *See* H.R.Rep. No. 63–160, at 2 (1913); Hughes, *supra*, at 117. From 1909 through 1915, therefore, the proposed legislation provided a remedy "on the high seas, the Great Lakes, or any navigable waters of the United States." H.R. 15810, 61st Cong. § 1 (1909); S. 6291, 61st Cong. § 1 (1910); H.R. 24764, 62d Cong. § 1 (1912); S. 6930, 62d Cong. § 1 (1912); H.R. 6143, 63d Cong. § 1 (1913); H.R. 6143, 63d Cong. § 1 (1915). The rest of DOHSA's legislative history concerns the narrowing of this provision.

In the 1914 congressional debates on DOHSA, conducted in the wake of litigation growing out of the Titanic disaster in 1912, objections arose that the bill would oust state jurisdiction over wrongful death and substitute an inadequate federal remedy. *See, e.g.,* 14 Cong. Rec.1929 (Jan. 19, 1914) (statement of Rep. Bryan); id. at 1928 (statement of Rep. Mann). In response to opposition from members of Congress and local practitioners, the MLA abandoned its effort to draft a uniform remedy. Instead, it submitted a new bill in 1916 that "does not interfere with the law in force. . . . It simply covers waters that are not now covered." *See* Right of Action for Death on the High Seas: Hearing Before the Committee on the Judiciary, Subcommittee No. 2, 64th Cong., 1st Sess. 17 (Feb. 4, 1916) [1916 Hearing].

The 1916 version of DOHSA preserved state remedies in three significant ways. First, the drafters changed "any navigable waters of the United States" to "any navigable waters of the Panama Canal Zone, the District of Columbia, or the Territories or dependencies of the United States," eliminating DOHSA's reach over navigable waters within state jurisdiction. S. 4288, 64th Cong. § 1 (1917); H.R. 39, 65th Cong. § 1 (1917). Second, the drafters added a section, which became § 7 of DOHSA, that provided that the act would not affect state wrongful death remedies for deaths in state territorial waters. This provision also exempted the Great Lakes or "any waters within the territorial limits of any State" from DOHSA's scope. S. 4288, 64th Cong. § 6 (1917); H.R. 39, 65th Cong. § 6 (1917). Finally, the later drafts added the words "beyond a marine league" to § 1, so that the proposed act covered deaths "on the high seas beyond a marine

league from the shore of any State." S.2085, 66th Cong. § 1 (1919); S. 4288, 64th Cong. § 6 (1917); H.R. 39, 65th Cong. § 1 (1917). This version of DOHSA was narrowed further when the Secretary of War requested that Congress avoid legislating in the Panama Canal Zone. *See* S.Rep. No. 66–216, at 5 (1919). The Panama Canal Zone reference was moved to § 7, which lists certain waters excluded from DOHSA's scope.

The statute that Congress passed in 1920 created a remedy for wrongful death "occurring on the high seas beyond a marine league from the shore of any State, or the District of Columbia, or the Territories or dependencies of the United States." 46 U.S.C. app. § 761. The parties agree that the phrase "beyond a marine league" excludes from DOHSA's reach state territorial waters, which traditionally lay within three nautical miles from shore.[8]

C.  The Meaning of "High Seas"

As noted above, the parties agree that the crash occurred beyond a marine league, or more than three miles, from the coast of Long Island. Plaintiffs contend that "high seas" covers those waters that lie beyond United States territorial waters, that is, international waters. Defendants argue that "high seas" means all waters beyond the low-water mark, and that the words "beyond a marine league" modify the phrase "high seas" by excluding from DOHSA's coverage those waters that, although considered "high seas," fall within the traditional bounds of state jurisdiction. As the considerable research of both parties indicates, there is authority to support either understanding of the term "high seas." We believe that plaintiffs' understanding of "high seas" is superior, however, because it rests on the Supreme Court's definition of "high seas" at the time DOHSA was enacted, a definition that the Supreme Court and this court have reiterated in the decades following DOHSA. Furthermore, no post-DOHSA authority supports defendants' definition of "high seas" as "beyond the low-water mark."

1.  The Supreme Court's Understanding of "High Seas" at the Time of DOHSA's Enactment

Although the boundary of this country's territorial sea at roughly three miles remained constant for almost two centuries, this limit was set on an ad hoc basis. In 1793, seeking to remain neutral in the war between France, Britain and Spain in the Atlantic Ocean, Secretary of State Thomas Jefferson claimed the "smallest distance" for the extent of American territorial seas.[9] Relying on "the utmost range of a cannon ball, usually stated at one sea league," Jefferson made a claim for three nautical miles. *See* OLC Opinion at 10. Although Jefferson reserved "the ultimate extent" of the claim "for future deliberation," and noted that a case could be made for 20 miles, *see id.*, the scope of our territorial sea remained constant until 1988. *See infra* Section II.D.

By the time DOHSA was enacted in 1920, the Supreme Court generally interpreted "high seas" to mean international or non-sovereign waters, most notably in the cases upon which the authors and supporters of DOHSA relied. In 1881, for example, the Supreme Court described the "high seas" as "where the law of no particular State has exclusive force, but all are

---

8.  The territorial waters of Texas and Florida, however, extended three leagues seaward (roughly 10 miles), based on the boundaries extant when Texas was admitted, and Florida readmitted, into the Union. *See United States v. Louisiana*, 363 U.S. 1, 64, 80 S.Ct. 961, 4 L.Ed.2d 1025 (1960); *United States v. Florida*, 363 U.S. 121, 128–29, 80 S.Ct. 961, 4 L.Ed.2d 1096 (1960).

9.  *See* Douglas W. Kmiec, Office of Legal Counsel, Legal Issues Raised by the Proposed Presidential Proclamation to Extend the Territorial Sea, 1 Terr. Sea J. 1, 9–10 (1990) [OLC Opinion].

equal." *The Scotland*, 105 U.S. 24, 29, 26 L.Ed. 1001 (1881); *see also La Bourgogne*, 210 U.S. at 115, 28 S.Ct. 664 (using *The Scotland*'s definition). In the years DOH-SA was pending before Congress, Justice Holmes characterized the "high seas" as "outside the territory, in a place belonging to no other sovereign," *The Hamilton*, 207 U.S. at 403, 28 S.Ct. 133, and as a region "subject to no sovereign." *American Banana Co. v. United Fruit Co.*, 213 U.S. 347, 355, 29 S.Ct. 511, 53 L.Ed. 826 (1909).

These decisions, which interpreted "high seas" to mean "non-territorial waters," shaped the terms of the debate over DOH-SA. The House and Senate Judiciary Committee Reports largely consisted of letters from supporters of DOHSA. These DOHSA proponents repeatedly invoked *The Hamilton* and *The Scotland* in the course of describing the purpose and meaning of DOHSA. *See* H.R.Rep. No. 66–674, at 1–4 (1920); S.Rep. No. 66–216, at 2–4 (1919); H.R.Rep. No. 64–1419, at 1–4 (1917); S. Rep. 64–741, at 1–5 (1916); H.R.Rep. No. 63–160, at 1–5 (1913). Under the Supreme Court's analysis in *McDermott*, 498 U.S. at 341–42, 111 S.Ct. 807, the consistent reliance on these decisions in setting the terms of the debate over DOHSA strongly suggests that Congress understood "high seas" to mean what these cases said it did, that is, international waters.[10] Similarly, the dissent's failure to address any of these cases causes it to misinterpret the statute, by equating "high seas" with "beyond a marine league."

In support of their interpretation, defendants rely heavily on the statements of Congressman Bryan of Washington, an opponent of DOHSA, who argued in 1914 that the "high seas" would include the waters of Puget Sound. See 14 Cong. Rec.1929 (Jan. 19, 1914) (statement of Rep.

Bryan). Yet "it is well established that speeches by opponents of legislation are entitled to relatively little weight in determining the meaning of the Act in question." *Holtzman v. Schlesinger*, 414 U.S. 1304, 1313 n. 13, 94 S.Ct. 1, 38 L.Ed.2d 18 (1973). Even if these statements were relevant, the context of Rep. Bryan's remarks reveals that DOHSA's sponsors repeatedly disavowed his interpretation. *See* 14 Cong. Rec.1929 (Jan. 19, 1914) (statement of Rep. McCoy) ("Puget Sound is not a part of the high seas.... [T]he term 'high seas' refers to that part of the ocean outside of the three-mile limit."); *id.* (statement of Rep. Cox) (defining the high seas as where "[t]he States have no jurisdiction").

The Supreme Court continued to define "high seas" as "international waters" in the years immediately following DOHSA. In *Cunard S.S. Co. v. Mellon*, 262 U.S. 100, 43 S.Ct. 504, 67 L.Ed. 894 (1923), the Court ruled that a Prohibition statute could be enforced only within the territorial limits of the United States. *See id.* at 122–23, 43 S.Ct. 504. The Court rejected the argument that the Prohibition Amendment covered ships "outside the waters of the United States, whether on the high seas or in foreign waters," because "on the high seas ... there is no territorial sovereign." *Id.* at 123, 43 S.Ct. 504; *see also Maul v. United States*, 274 U.S. 501, 511, 47 S.Ct. 735, 71 L.Ed. 1171 (1927) ("The high sea is common to all nations and foreign to none....").

It is true that the Court has not provided a consistent definition of "high seas" throughout the past two centuries. Defendants' understanding of the "high seas" as those seas beyond the low-water mark appears to have been shared by Justice Story, who characterized the high seas as "the

---

**10.** Statements in a congressional report lack the force of law. *See American Hosp. Ass'n v. NLRB*, 499 U.S. 606, 616, 111 S.Ct. 1539, 113 L.Ed.2d 675 (1991). However, "[a] committee report, representing a collective statement by the drafters about the intended purpose of proposed legislation, is considered a particularly good indicator of congressional intent when it is otherwise difficult to ascertain." *Pierpoint v. Barnes*, 94 F.3d 813, 817 (2d Cir.1996).

open, uninclosed ocean, or that portion of the sea, which is without the fauces terrae on the sea coast." *United States v. Grush*, 26 F.Cas. 48, 51 (D.Mass.1829); [11] *see United States v. Ross*, 27 F.Cas. 899, 900 (D.R.I.1813) (employing similar definition); *see also The Manila Prize Cases*, 188 U.S. 254, 271, 23 S.Ct. 415, 47 L.Ed. 463 (1903) (relying on Justice Story's definition); *United States v. Rodgers*, 150 U.S. 249, 253–55, 14 S.Ct. 109, 37 L.Ed. 1071 (1893) (same). Yet Justice Story's definition was not the authoritative definition of "high seas." In the early nineteenth century, Justices Thompson and Baldwin, sitting in district court cases, interpreted "high seas" to mean non-sovereign waters. *See Rodgers*, 150 U.S. at 268, 14 S.Ct. 109 (Gray, J., dissenting) (citing *United States v. Jackson*, 26 F. Cas. 558, 559 (C.C.S.D.N.Y.1843) (No. 15,547) (stating that "the high seas were, properly speaking, within the territory of no state or country"); *United States v. Morel*, 26 F. Cas. 1310, 1312 (C.C.E.D.Pa.1834) (No. 15,807) ("The open sea, the high sea, the ocean, is that which is . . . under the particular right or jurisdiction of no sovereign . . . .")). Because defendants' definition of high seas as "beyond the low-water mark" was neither the dominant definition of "high seas," nor the definition used in those Supreme Court cases that shaped the congressional debate over DOHSA, nor, as discussed below, is it used in modern decisions concerning DOHSA, we reject it.[12]

## 2. The Structure and Purpose of DOHSA

An analysis of the structure and purpose of DOHSA also supports plaintiffs' under-

standing of "high seas." We should interpret both "high seas" and "beyond a marine league" to have independent meaning. *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 574, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) ("[T]he Court will avoid a reading which renders some words altogether redundant."). Defendants' definition violates this canon of statutory construction because it renders "high seas" superfluous. Defendants provide no examples in which the low-water mark is not well within a marine league, that is, three nautical miles, of the coast. We do not see why Congress would have retained two geographical boundaries in the statute when one—beyond a marine league—subsumes the other. The dissent would also violate this canon of statutory construction by equating "high seas" with "beyond a marine league." The dissent's arguments that Congress intended "both to define and to indicate," that "high seas" is "definitional," and that Congress wanted to "inject as much clarity as possible," dissent at 216, 223, provide no justification for depriving "high seas" of independent meaning.

Plaintiffs' interpretation, however, defines "beyond a marine league" as a geographical boundary and "high seas" as a political boundary subject to change. While the geographical and political boundaries were coterminous in 1920, there was no reason to think that would always be the case. See supra note 9 and accompanying text. At the time DOHSA was enacted, the "minimum limit of the territorial jurisdiction of a nation," *Manchester v. Massachusetts*, 139 U.S. 240, 258, 11 S.Ct. 559, 35 L.Ed. 159 (1891), was a marine league. "The void that existed in

---

**11.** "Fauces terrae" literally "jaws of the land," are "narrow headlands and promontories, inclosing a portion or arm of the sea within them." *Black's Law Dictionary* 738 (4th ed.1951).

**12.** Defendants repeatedly relied on *Ross v. McIntyre*, 140 U.S. 453, 11 S.Ct. 897, 35 L.Ed. 581 (1891), both in their brief and at oral argument, to support their definition of "high seas." Arising out of a murder in Yok-

ohama, *Ross* involved a challenge to the ability of a consular tribunal to conduct criminal proceedings. Although the Court stated that, " '[H]igh seas' includes water on the sea coast [beyond] the boundaries of low-water mark," it did so only in the course of setting forth a position that it rejected. *See id.* at 470–71, 11 S.Ct. 897. *Ross* does not endorse this definition of "high seas."

maritime law up until 1920 was the absence of any remedy for wrongful death on the high seas. Congress, in acting to fill that void, legislated only to the three-mile limit because that was the extent of the problem." *Moragne,* 398 U.S. at 398, 90 S.Ct. 1772.

Furthermore, the legislative history of DOHSA shows that while "high seas" was always part of the statutory language, "beyond a marine league" was not added until later drafts, to preserve state remedies. Congress added this section at the same time it dropped "any navigable waters of the United States." *See supra* Subsection II.B. Defendants do not explain why Congress did not also drop "high seas" at that point in the drafting process; under defendants' interpretation that high seas means those waters beyond the low-water mark, the phrase "beyond a marine league" would by itself exclude state territorial waters.[13] Congress's decision to retain the phrase "high seas" strongly supports plaintiffs' claim that "high seas" has a different independent meaning: it denotes international waters beyond both state and federal territorial waters.

Not only did Congress retain the phrase "high seas" in § 1, but also Congress inserted another provision in the 1919 drafts of the statute that used the phrase "high seas." Section 4 provides that, "[w]henever a right of action is granted by the law of any foreign State on account of death by wrongful act, neglect, or fault, occurring upon the high seas, such right may be maintained in an appropriate action in admiralty in the courts of the United States . . . ." 46 U.S.C. app. § 764. By suggesting that foreign nations may well have legislated their own wrongful death remedies for the "high seas," § 4 indicates that "high seas" lay outside the sole jurisdiction of the United States. Thus § 4's reference to "high seas" indicates international waters, "a place belonging to no

other sovereign" in Justice Holmes's phrase. *The Hamilton,* 207 U.S. at 403, 28 S.Ct. 133. Congress's use of "high seas" as international waters in § 4 strongly suggests that it used "high seas" to mean international waters in § 1.

Plaintiffs' interpretation of "high seas" as international, that is, nonterritorial, waters is also consistent with § 7 of DOHSA. That section states:

> The provisions of any State statute giving or regulating rights of action or remedies for death shall not be affected by this chapter. Nor shall this chapter apply to the Great Lakes or to any waters within the territorial limits of any State, or to any navigable waters in the Panama Canal Zone.

46 U.S.C. app. § 767. Defendants argue that § 7 lists waters excluded from DOHSA's scope, so that this section would be devoid of meaning if plaintiffs' definition of "high seas" as nonterritorial waters were correct, because none of the waters listed in § 7 are nonterritorial waters. This argument ignores that the drafters of DOHSA were forced to expressly disclaim any ouster of state remedies for wrongful death. On the floor of the House of Representatives, there were objections that § 7 was "superfluous" because § 1 clearly limited the scope of DOHSA to the high seas. One of DOHSA's supporters responded that § 7 was added "out of an abundant caution, to calm the minds" of DOHSA's opponents. 59 Cong. Rec. 4482–83 (Mar. 17, 1920) (statement of Rep. Montague). Section 7 was inserted to clarify that state waters were not subject to DOHSA. *See Tallentire,* 477 U.S. at 231–32, 106 S.Ct. 2485. As Judge Sweet pointed out, the aim of § 7 is not to set forth all waters that are beyond the scope of DOHSA, because it makes no mention of the territorial waters referred to in § 1 that are not within the scope of DOHSA (waters within a marine league of the shore of

---

**13.** The dissent's analysis, which would equate "high seas" with "beyond a marine league," also suffers from the same omission.

"the District of Columbia, or the Territories or dependencies of the United States").

Finally, applying DOHSA to federal territorial waters would subvert DOHSA's purpose of creating a remedy where none existed before, rather than displacing preexisting state or federal remedies. The legislative history "indicates that Congress intended to ensure the continued availability of a remedy, historically provided by the States, for deaths in territorial waters." *Moragne*, 398 U.S. at 397, 90 S.Ct. 1772; see also Hughes, supra, at 118 (as revised, DOHSA was "intended to be supplementary to the local statutes and applicable to waters which they did not reach"). Congress intended to exclude federal territorial waters from the scope of DOHSA because federal and state common-law remedies already existed for deaths in those waters.[14]

It would be particularly inappropriate to displace preexisting state or federal remedies where, as here, recovery could be more generous than under DOHSA. As the Supreme Court noted in *Moragne*, "the state remedies that were left undisturbed not only were familiar but also may actually have been more generous than the remedy provided by the new Act." *Moragne*, 398 U.S. at 398, 90 S.Ct. 1772; *see also Public Adm'r of the County of New York v. Angela Compania Naviera*, 592 F.2d 58, 63 (2d Cir.1979) ("[W]here a death is caused inside territorial waters, however, and a wrongful death action is brought under the general maritime law, the subsidiary elements of the cause of action may be different from or broader than those delineated in the Death on the High Seas Act."). The Supreme Court has frequently reiterated Chief Justice Chase's admonition that, "the humane and liberal character of proceedings in admiralty" advises in favor of more generous recovery. *The Sea Gull*, 21 F.Cas. at 910; *see Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199, 116 S.Ct. 619, 627, 133 L.Ed.2d 578 (1996) (quoting Chief Justice Chase); *Moragne*, 398 U.S. at 387, 90 S.Ct. 1772 (same). The statute and legislative history demonstrate that in DOHSA, Congress prioritized the preservation of preexisting remedies over securing uniformity in admiralty law. *See Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 624, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978). Because defendants' interpretation of the critical language in DOHSA would oust preexisting remedies for deaths in territorial waters, which may prove to be more generous than recovery under DOHSA, we reject that interpretation as inconsistent with the purpose of the statute.

### 3. The Meaning of "High Seas": 1920–1988

■ For most of the century there was no band of United States territorial waters between state territorial waters and the high seas similar to that created by Proclamation 5928, which in 1988 extended United States territorial waters from three to 12 miles. It was not inaccurate to say that the high seas effectively began at a marine league, i.e., three nautical miles from the shore of any state.[15] Thus, as was the case with defendants' definition of "high seas" as "beyond the low-water mark," there is some support for the claim that "high seas" equals "beyond a marine

---

14. The dissent objects that "[n]o clear remedies existed for wrongful death beyond state territorial waters after *The Harrisburg*, a gap in the law that DOHSA was designed expressly to fill." Dissent at 224. This argument simply ignores the cases in which the courts, including the Supreme Court, provided remedies in an effort to ameliorate the harsh rule of *The Harrisburg*. *See* Section II.A.

15. Some cases provide rather abbreviated descriptions of DOHSA. *Kernan v. American Dredging Co.*, 355 U.S. 426, 78 S.Ct. 394, 2 L.Ed.2d 382 (1958), for example, omits both the "high seas" language and the statutory language concerning United States territories: "Where death occurs beyond a marine league from state shores, the Death on the High Seas Act ... provides a remedy for wrongful death." *Id.* at 430 n. 4, 78 S.Ct. 394.

league." [16] There is scant authority, however, for the claim that even in light of Proclamation 5928, the high seas still begin at one marine league, rather than at the 12–mile boundary the Proclamation established.

In the years following DOHSA, the dominant understanding of "high seas" remained "beyond United States territorial waters." In *United States v. Louisiana*, 394 U.S. 11, 89 S.Ct. 773, 22 L.Ed.2d 44 (1969) [*Louisiana I* ], which concerned the scope of the Submerged Lands Act, the Supreme Court provided a jurisdictional map of the seas:

> Under generally accepted principles of international law, the navigable sea is divided into three zones.... Nearest to the nation's shores are its inland, or internal waters. These are subject to the complete sovereignty of the nation.... Beyond the inland waters, and measured from their seaward edge, is a belt known as the marginal, or territorial sea. Within it the coastal nation may exercise extensive control but cannot deny the right of innocent passage to foreign nations. *Outside the territorial sea are the high seas, which are international waters not subject to the dominion of any single nation.*

*Id.* at 22–23, 89 S.Ct. 773 (emphasis added); see also *United States v. Louisiana*, 470 U.S. 93, 98, 105 S.Ct. 1074, 84 L.Ed.2d 73 (1985) [*Louisiana II* ] (same). In setting forth this scheme, the Court relied on the United States Convention on the High Seas, which states that, "The term 'high seas' means all parts of the sea that are not included in the territorial sea or in the internal waters of a State," United States Convention on the High Seas, Apr. 29, 1958, [1962] 13 U.S.T. 2313, 2314 art. 1, and that the high seas are "open to all nations." *Id.* art. 2; *see Louisiana I*, 394 U.S. at 23 n. 26, 89 S.Ct. 773.

The Supreme Court has frequently considered the extent and nature of wrongful-death remedies under general maritime law. From DOHSA (enacted in 1920) to *Moragne* (decided in 1970), DOHSA provided the remedy for deaths on the high seas, while state wrongful death statutes provided the remedy for deaths in territorial waters. *See Higginbotham*, 436 U.S. at 621, 98 S.Ct. 2010. After *Moragne* overruled *The Harrisburg* and established a remedy for wrongful death under general maritime law, subsequent cases set forth the elements of a *Moragne*-type remedy. *See Sea–Land Services, Inc. v. Gaudet*, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974) (allowing recovery under general maritime law for loss of support and services, funeral expenses, and loss of society, but not mental anguish); *Miles v. Apex Marine Corp.*, 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990) (setting forth damages recoverable under general maritime law for seaman's wrongful death). Where the death occurs on the high seas, however, the Court has made clear that DOHSA is the exclusive remedy. *See Higginbotham*, 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (denying recovery under general maritime law); *Tallentire*, 477 U.S. at 232–33, 106 S.Ct. 2485 (denying recovery under state statute); *Zicherman v. Korean Air Lines*, 516 U.S. 217, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996) (denying loss-of-society damages); *Dooley v. Korean Air Lines*, 524 U.S. 116, 118 S.Ct. 1890, 141 L.Ed.2d 102 (1998) (denying damages for pre-death pain and suffering). Where the death did not occur on the high seas, but in territorial waters, DOHSA does not oust state remedies. In a recent discussion of DOHSA, the Supreme Court unanimously concluded that § 7 of DOHSA "stops DOHSA from displacing state law in territorial waters." *Yamaha*, 116 S.Ct.

---

**16.** Defendants seem to offer somewhat conflicting definitions of "high seas." In their discussion of the drafting and intent of the statute, they endorse the "beyond the low-water mark" definition, while in their discus-

sion of the cases addressed hereafter in Sections II.C.4 and II.D, they appear to equate "high seas" with "beyond a marine league," as do the cases they rely upon.

at 628 (citations omitted). Because the Court was obliged to "preserve the application of state statutes to deaths within territorial waters," *id.*, it rejected a claim that DOHSA was the remedy for a death that occurred in the waters of Puerto Rico, a territory of the United States. Apart from *Yamaha*, none of these cases concerned the application of DOHSA to federal territorial waters nor did they define the scope of DOHSA.[17]

This court has generally interpreted "high seas" to mean international waters. In 1924, for example, we characterized the "high seas" as " 'where the law of no particular state has exclusive force, but all are equal.' " *The Buenos Aires*, 5 F.2d 425, 436 (2d Cir.1924)(quoting *The Scotland*, 105 U.S. at 29), and " 'the common ground of all nations.' " *Id.* (citation omitted). Similarly, in *Cove Tankers Corp. v. United Ship Repair, Inc.*, 683 F.2d 38, 40 n.1 (2d Cir.1982), we noted that "the Supreme Court's definition of high seas" was " 'international waters not subject to the dominion of any single nation.' " *Id.* at 40 & n. 1 (quoting *Louisiana I*, 394 U.S. at 22–23, 89 S.Ct. 773). We have also explicitly relied on the boundary between territorial and international waters in setting the scope of DOHSA, explaining that the purpose of DOHSA "was to create a uniform cause of action where none existed before and which arose beyond the territorial limits of the United States or any State thereof." *D'Aleman v. Pan Am. World Airways*, 259 F.2d 493, 495 (2d Cir.1958).

Defendants rely heavily on statements of this court that the high seas begin where state territorial waters end. *See,*

*e.g., First Nat'l Bank in Greenwich v. National Airlines, Inc.*, 288 F.2d 621, 622 (2d Cir.1961) (noting that DOHSA applied beyond the territorial waters of Alabama). This argument overlooks that when those cases were decided, there were no federal territorial waters that lay between state territorial waters and the high seas. Thus the boundary between the high seas and state waters was the same as the boundary between the high seas and federal waters. Where federal territorial waters do exist, however, the high seas begin where those federal territorial waters end. *See, e.g., Yamaha*, 116 S.Ct. at 628.

Defendants also point to a statement in *Wahlstrom v. Kawasaki Heavy Indus., Ltd.*, 4 F.3d 1084, 1085 (2d Cir.1993), which states that DOHSA "gave the representative of anyone killed on the high seas (i.e., more than three miles from shore) the right to bring a wrongful death action." *Id.* at 1088. *Wahlstrom* nowhere refers to Proclamation 5928, and it seems to have assumed that the traditional three-mile boundary remained in effect even after 1988.[18] In any event, it was beyond dispute that the death in *Wahlstrom* occurred on a river in Connecticut, where DOHSA would clearly not apply. *See id.* at 1086. This parenthetical reference, in a case that did not involve the scope of DOHSA, cannot be read to overrule the clear statements of this court that DOHSA applies only outside United States territorial waters.

### 4. The Application of DOHSA to Foreign Territorial Waters

Defendants rely on a line of cases applying DOHSA to the territorial waters of a

---

17. In a footnote, *Yamaha* states that DOHSA "provides a federal claim for wrongful death occurring more than three nautical miles from the shore of any State or Territory." *Yamaha*, 116 S.Ct. at 624 n. 4. This definition not only makes no mention of "high seas," but also there is no indication that the Court considered the effect of Proclamation 5928, issued eight years before. The Proclamation was not mentioned in any of the briefs to the Court, nor at oral argument. See Brief for the Petitioners, *Yamaha* (No. 94–1387), 1995

WL 451711; Brief of Respondents, 1995 WL 551075; Petitioners' Reply Brief, 1995 WL 601284; Brief Amicus Curiae of the National Marine Manufacturers' Association, 1995 WL 703412; Oral Argument, 1995 WL 648001.

18. As none of the briefs in *Wahlstrom* mentioned Proclamation 5928, the issue was not before the court. See Brief of Appellant, *Wahlstrom* (No. 92–7948); Brief of Appellees; [Reply] Brief of Appellant.

foreign state to suggest that the scope of DOHSA is not coextensive with international waters. In *In re Air Crash Disaster Near Bombay, India on January 1, 1978*, 531 F.Supp. 1175 (W.D.Wash.1982), for example, the court ruled that because the remedy created by DOHSA should be broadly construed, DOHSA applied within the territorial waters of India. *See id.* at 1182–83. In *Jennings v. Boeing Co.*, 660 F.Supp. 796 (E.D.Pa.1987), aff'd. without op., 838 F.2d 1206 (3d Cir.1988), the court applied DOHSA to a plane crash two and a half miles off the coast of the Shetland Islands, Scotland. The application of DOHSA to foreign territorial waters has produced somewhat unusual results, such as the extension of DOHSA to a river in Peru, *see Cormier v. Williams/Sedco/Horn Constructors*, 460 F.Supp. 1010, 1011 (E.D.La.1978), and a lake in Venezuela, see *Sanchez v. Loffland Bros. Co.*, 626 F.2d 1228, 1230 n. 4 (5th Cir. Unit A 1980).[19]

Obviously, we are not faced here with a wrongful death claim arising out of an accident in the territorial waters of a foreign nation. We take no position on what courts should do when faced with the difficult question of whether to apply DOHSA in foreign territorial waters, where plaintiffs might otherwise be left with only foreign remedies in foreign courts. The decisions applying DOHSA to foreign territorial waters seek to provide a remedy in federal court for survivors of those killed in maritime accidents. *See Jennings*, 660 F.Supp. at 803; *Bombay*, 531 F.Supp. at 1183. These decisions do not require—or even suggest—the application of DOHSA to the territorial waters of the United States, where plaintiffs already have a state or federal remedy. *See, e.g., Yamaha*, 116 S.Ct. at 628. Furthermore, none of these cases support defendants' interpretation of the relevant statutory language in DOHSA. Neither *Jennings*

nor *Bombay*, nor any of the other cases that apply DOHSA to foreign territorial waters, adopt defendants' argument that "high seas" means "beyond the low-water mark." In fact, the Ninth Circuit in *Howard* comes closer to plaintiffs' interpretation, explaining that DOHSA "was expressly designed to cover wrongful deaths occurring outside the territorial boundaries of the United States." *Howard*, 41 F.3d at 530; *see also Public Adm'r*, 592 F.2d at 63 (same). Thus, we find no basis for reversal on this point.

**D. The Effect of Presidential Proclamation No. 5928**

The parties do not dispute that had the crash occurred before Presidential Proclamation No. 5928 was issued in 1988, the crash would have occurred beyond United States territorial waters so that DOHSA would apply. The issue, therefore, is whether after issuance of the Proclamation, DOHSA applied to the waters between three and 12 miles from the shore. The Proclamation, issued by President Reagan, provides for:

> the extension of the territorial sea of the United States of America, the Commonwealth of Puerto Rico, Guam, American Samoa, the United States Virgin Islands, the Commonwealth of the Northern Mariana Islands, and any other territory or possession over which the United States exercises sovereignty.
>
> The territorial sea of the United States henceforth extends to 12 nautical miles from the baselines of the United States determined in accordance with international law.

Proclamation No. 5928, 54 Fed.Reg. 777 (1988). As Judge Sweet noted:

> The President also expressly stated that the Proclamation is consistent with international law. Cf. [OLC] Opinion, at 3

---

**19.** Several courts have also applied DOHSA to the territorial waters of other foreign countries or territories, *see, e.g., Howard v. Crystal Cruises, Inc.*, 41 F.3d 527, 529 (9th Cir.1994) (Mexico); *Kunreuther v. Outboard Marine Corp.*, 757 F.Supp. 633, 634 (E.D.Pa.1991) (Jamaica); *Kuntz v. Windjammer "Barefoot" Cruises, Ltd.*, 573 F.Supp. 1277, 1280 (W.D.Pa.1983), aff'd. without op., 738 F.2d 423 (3d Cir.1984) (Bahamas).

n. 6 (as of 1988, "[o]ne hundred four nations now claim a twelve-mile territorial sea, while only thirteen maintain the three-mile limit."); Restatement (Third) of the Foreign Relations Law of the United States § 511 (1987) (international law allows nations to "exercise jurisdiction over ... [t]he territorial sea ... a belt of sea that may not exceed 12 nautical miles"). The President's exercise of constitutional power over foreign affairs is therefore consistent with international law.

The Proclamation thus alters the three-mile boundary that had historically defined the territorial sea. *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 441 n. 8, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989). Concluding that "Congress intended DOHSA's application to depend on the border between United States and international territory," Judge Sweet here explained that the Proclamation effectively moved the starting point of DOHSA from three to 12 miles offshore. As the crash occurred eight miles off the coast of Long Island, the district court ruled, it occurred within the territorial waters of the United States and DOHSA did not apply.

Defendants note that the Proclamation includes a provision that states as follows: "Nothing in this Proclamation ... extends or otherwise alters existing Federal or State law or other jurisdiction, rights, legal interests or obligations derived therefrom." Defendants argue that the district court imputed an effect to the Proclamation that it explicitly disclaimed. Commenting on the effect of the Proclamation, the Office of Legal Counsel of the United States Department of Justice explained: "The issue ... is whether Congress intended for the jurisdiction of any existing statute to include an expanded territorial sea. Thus, the question is one of legislative intent." OLC Opinion, *supra*, at 22.[20] Therefore, the impact of the Proclamation

must be assessed on a statute-by-statute basis. In *United States v. One Big Six Wheel*, 166 F.3d 498, 499 n. 1 (2d Cir.1999), for example, this court held that a provision of the Antiterrorism and Effective Death Penalty Act that expanded the territorial waters of the United States for purposes of that statute did not thereby expand federal criminal jurisdiction under the Gambling Ship Act. *Big Six Wheel* does not answer the question of whether Congress would have intended the expanded territorial sea to be excluded from DOHSA. Based on our analysis of Congress's intent in enacting DOHSA, we decline to adopt defendants' view of the effect of the Proclamation.

The background and legislative history of DOHSA demonstrate Congress's intent to exclude all state and federal territorial waters from its scope. See supra Subsection II.B; *see also Yamaha*, 116 S.Ct. at 628 (concluding that "Congress has not prescribed remedies for the wrongful deaths of nonseafarers in territorial waters"). Nothing in DOHSA's history or purpose provides a persuasive reason to fix immutably the scope of the statute to the boundary between United States territorial waters and nonterritorial waters as it existed in 1920. Thus, plaintiffs are correct in concluding that the effect of the Proclamation is to move the starting point of the application of DOHSA from three to 12 miles from the coast. Plaintiffs' interpretation of the Proclamation does not change DOHSA, but designates certain additional waters to which DOHSA does not apply. If Congress in 1920 had included a definition of "high seas" as "waters outside United States or state territorial waters, where no nation is sovereign," as we believe it essentially did, the Proclamation would not change this definition. Indeed, if the Proclamation is construed to create a zone of federal territorial waters subject to DOHSA, then this would violate the disclaimer. DOHSA would effectively be

---

**20.** The Opinion further confirms that "the high seas ... are the remainder of the ocean beyond the territorial sea." OLC Opinion, *supra*, at 4.

amended by excluding federal territorial waters up to three miles from its coverage, but including federal territorial waters between three and 12 miles. Such an effect would be inconsistent with Congress's intent to exclude all federal territorial waters from the scope of DOHSA.

Despite defendants' assertion that "the overwhelming weight of controlling and persuasive judicial authority" supports their view, only two district courts, both in the Fifth Circuit, have discussed the effect of Proclamation 5928 on DOHSA.[21] *Francis v. Hornbeck Offshore (1991) Corp.*, 1997 WL 20740 (E.D.La. 1997), states that, "Proclamation 5928, by its own terms, does not alter DOHSA's application beyond one marine league from shore." The *Francis* court, however, reached this conclusion in two paragraphs without providing any analysis. Also, in *Blome v. Aerospatiale Helicopter Corp.*, 924 F.Supp. 805 (S.D.Tex.1996), the court suggested that DOHSA would apply beyond Texas state territorial waters and within federal territorial waters, but concluded that the location of the crash was an issue of fact that could not be resolved upon summary judgment. The more persuasive view of the effect of Proclamation 5928 is that it renders the three-mile limit to federal territorial waters "a vestigial concept." *Triton Container Int'l Ltd. v. Compania Anonima Venezolana De Navegacion*, 1995 WL 464481, at *3–4 (D. Guam 1995).

Defendants also argue that courts have consistently held that even after Proclamation 5928, DOHSA's coverage begins three miles from the shore of any state. *See Miller v. American President Lines, Ltd.*, 989 F.2d 1450, 1455 (6th Cir.1993); *In re Goose Creek Trawlers, Inc.*, 972 F.Supp. 946, 948 (E.D.N.C.1997); *In re American Dredging Co.*, 873 F.Supp. 1539, 1546 (S.D.Fla.1994), *aff'd, American Dredging Co. v. Lambert*, 81 F.3d 127 (11th Cir. 1996); *Smallwood v. American Trading & Transp. Co.*, 839 F.Supp. 1377, 1380 (N.D.Cal.1993); *In re Air Crash Disaster*

*Near Honolulu*, 783 F.Supp. 1261, 1264 (N.D.Cal.1992). The force of these cases is much more modest than defendants suggest. First, none mention Proclamation 5928. Second, none involved accidents between the traditional three-mile boundary and the 12–mile boundary created by the Proclamation, providing no occasion to address the issues raised in this case. The accidents in *Goose Creek, American Dredging*, and *Smallwood* occurred in what were clearly state waters. *Miller* was "an asbestos case," 989 F.2d at 1453, and the plaintiff was a seaman exposed to asbestos on defendant's ships over many years, while the accident in *Honolulu* occurred "over international waters approximately 85 nautical miles south of Honolulu." *In re Air Disaster Near Honolulu*, 792 F.Supp. 1541, 1543 (N.D.Cal.1990). Finally, none of these cases employ defendants' definition of "high seas" as "beyond the low-water mark." Instead, they equate "high seas" with "beyond a marine league," thereby rendering the former phrase surplusage.

Finally, the dissent's decision to begin its analysis with the Proclamation, using an executive act as a lens through which to interpret a statute passed by Congress 68 years earlier, foreordains its error. As indicated above, see supra Section II.A, we believe that the sounder approach is to begin with Congress's understanding of the language and purpose of DOHSA at the time it was enacted. The first section of the dissent simply assumes, without proving, that DOHSA is not "linked to the international legal understanding of the breadth of the U.S. territorial sea." Dissent at 218. This argument might seem persuasive only if one were to strip DOHSA of its context and ignore, as the dissent does, that the Supreme Court repeatedly used "high seas" to mean international waters at the time of the drafting and passage of DOHSA. *See, e.g., American Banana*, 213 U.S. at 355, 29 S.Ct. 511; *La Bourgogne*, 210 U.S. at 115, 28 S.Ct. 664;

---

**21.** The dissent makes the same sweeping assertion. See dissent at 216.

*The Hamilton*, 207 U.S. at 403, 28 S.Ct. 133; *The Scotland*, 105 U.S. at 29. Since DOHSA, both the Supreme Court and this court have affirmed the understanding of "high seas" as international waters. *See Louisiana II*, 470 U.S. at 98, 105 S.Ct. 1074; *Louisiana I*, 394 U.S. at 22–23, 89 S.Ct. 773; *Cove Tankers*, 683 F.2d at 40 n. 1; *The Buenos Aires*, 5 F.2d at 436. The dissent offers no refutation, or even mention, of any of these cases, which link the term "high seas" in.DOHSA to the boundary between international and United States territorial waters.

In sum, once the United States or any state or territory thereof has asserted sovereignty over certain waters, DOHSA does not govern the remedies available in those waters.

E.  Remedies in Federal Territorial Waters

Finally, defendants object that the district court created a "no-man's land" between three and 12 miles from the shore of the coastal states. As our discussion of DOHSA's history and purpose makes clear, the district court's decision did not create a "no-man's land," but recognized that the Proclamation created a larger zone of federal territorial waters. This zone of waters is governed by the same remedies that have traditionally governed federal territorial waters. Defendants insist that exempting the federal territorial waters affected by the Proclamation from DOHSA creates inconsistency and undermines uniformity. But it would be more inconsistent, and more arbitrary, to impose one remedial scheme over certain federal territorial waters (up to three miles) and a different remedial scheme over other federal territorial waters (from three to 12 miles).[22]

The core purpose of DOHSA was to provide a remedy where one did not exist before, not to oust either a *Moragne*-type remedy or state law remedies. The remedies available to plaintiffs for wrongful death in the federal territorial waters in which the crash occurred may prove better suited to this case than DOHSA's statutory requirements. As the Supreme Court did in *Yamaha,* we leave for the district court to resolve the conflict of law questions in determining which remedies are available.[23] We hold only that the Death on the High Seas does not apply to federal territorial waters.

III.  Conclusion

■ For the reasons stated above, we conclude that plaintiffs' interpretation of the relevant statutory language better reflects the meaning and purpose of the Death on the High Seas Act. Accordingly, we affirm the decision of the district court that DOHSA does not apply to the United States territorial waters where the crash in this case occurred. We remand this case to the district court for further proceedings consistent with this opinion.[24]

SOTOMAYOR, Circuit Judge, dissenting:

In an understandable desire to provide the relatives and estate representatives of

22.  This is also true of the dissent's analysis.

23.  The dissent objects that we "decline to address in even the most cursory fashion what law would actually apply in the TWA litigation." Dissent at [225]. The district court never ruled on the issue. We see no compelling need to depart from the standard practice of having the district court. address this question of law in the first instance.

24.  The dissent notes that while this case. was pending, see dissent at [207 n. 13], both houses of Congress passed a bill that would alter DOHSA by excluding from its scope commercial aviation crashes occurring on or after July 16, 1996. See H.R. 1000, 106th Cong. § 404 (2000). The bill is currently before the President. The parties have not notified the court as to the progress of this bill or taken any position with respect thereto. Under the circumstances, we take no position on the effect of the bill. Regardless of the bill, we conclude,.based on the record, the arguments of the parties and the district court's decision, that this crash is not subject to DOHSA.

the 213 victims of the TWA Flight 800 crash with a "more generous" recovery,[1] *ante* at 209, the majority fails to give proper effect to the limiting language of Proclamation 5982; to DOHSA's language, legislative history, and purpose; and to a wealth of case law since DOHSA's passage, all of which support the inexorable conclusion that DOHSA applies to *all* deaths occurring "beyond a marine league [three nautical miles] from the shore of any State," 46 U.S.C. App. § 761, and not only to deaths occurring beyond the U.S. territorial sea.

By its explicit terms, the Proclamation changed the meaning of the U.S. territorial sea—and thus its complement the "high seas"—for international, but not domestic, law purposes. The majority nevertheless applies the territorial boundaries set forth in the Proclamation to DOHSA, even though the meaning of "high seas" for the purposes of DOHSA is a question purely of domestic law. Moreover, the majority's application of the Proclamation to DOHSA is grounded almost entirely on its interpretation of what Congress probably thought the term "high seas" meant at the time of DOHSA's passage, i.e., "waters ... where no nation is sovereign," *ante* at 213–14, and the majority's assumption that Congress viewed the three nautical mile line at which the high seas commenced as a "political boundary line subject to change," *ante* at 207. Based on this reasoning, the majority concludes that the Proclamation's expansion of the boundary line of the U.S. territorial sea from three to twelve nautical miles necessarily excluded DOHSA's application in this nine mile zone.

The majority's focus on Congress' understanding of the term "high seas" in 1920 is misplaced. The majority ignores that the DOHSA Congress, by using the

phrase "high seas beyond one marine league from the shore of any State," intended both to define and to indicate the geographical boundary line at which the high seas began—three nautical miles from the U.S. coast—because that boundary line coincided with the outer border of the states' territorial seas. Congress wished to preserve state remedies in state waters, and to provide a separate remedy, i.e. DOHSA, to waters subject only to federal jurisdiction, i.e., "the high seas beyond a marine league." Simply stated, it is irrelevant whether Congress shared the international legal understanding of "high seas" as "non-sovereign waters," because its only concern at the time of DOHSA's passage was state, and not federal, boundaries. Nothing in DOHSA's language or legislative history supports the majority's conclusion that Congress intended "high seas" to be a variable term "subject to change" because of evolving international concepts.

The majority's conclusion is also contrary to the holdings and dicta of every other court that has considered this issue, and cannot be reconciled with a long line of cases from at least four other circuits applying DOHSA to deaths occurring in foreign territorial waters—in other words, waters indisputably subject to foreign sovereigns.

For these reasons, discussed more fully below, I do not believe that the Proclamation replaced DOHSA with general federal maritime law in the zone of waters lying between three and twelve nautical miles seaward of the U.S. coast (the "disputed zone"). I therefore respectfully dissent.

## DISCUSSION

### A. The Proclamation

As drafted, DOHSA provides a statutory remedy for wrongful deaths that occur "on

---

1. The ruling also will affect substantially the available recovery in the 145 cases related to the crash which have been consolidated before the district court. *See In re Air Crash Off Long Island*, 1998 WL 292333, at *1 (S.D.N.Y.). It may also influence the out-

come of any cases brought by the representatives of the 88 victims of the Alaska Airlines crash, which occurred approximately ten nautical miles off the coast of California. *See* Chuck Taylor et al., Flight 261: *Looking for Answers*, Seattle Times, Feb. 2, 2000, at A1.

the high seas beyond a marine league [or three nautical miles] from the shore of any State, or the District of Columbia, or the Territories or dependencies of the United States." 46 U.S.C. App. § 761. In 1920, when DOHSA was enacted, the three nautical mile line marking the start of the "high seas," and the end of U.S. territorial waters, coincided with the line bounding the states' territorial seas. The 1988 Proclamation, by extending the "territorial waters of the United States" from three to twelve nautical miles from the U.S. coast, ended this coincidence for international law purposes. 54 Fed.Reg. 777 (Dec. 27, 1988). This appeal poses the question whether the Proclamation changed DOHSA's zone of application by rendering it effective only beyond the twelve nautical mile line.

The Proclamation modified the definition of "U.S. territorial waters"—and therefore the beginning point of the high seas—for international, but not domestic, law purposes. The Proclamation "extended the United States territorial waters to twelve nautical miles for the *limited purpose* of conforming to the territorial limits then permitted by international law [and] explicitly *limits its application* by declaring that '[it does not extend or otherwise alter] existing Federal or State law or any jurisdiction, rights, legal interests, or obligations derived therefrom.'" *United States v. One Big Six Wheel,* 166 F.3d 498, 501 (2d Cir.1999) (quoting Proclamation) (emphasis added). As the Supreme Court has observed, "the President[ ] 'proclaimed' a 12–mile territorial sea *for inter-*

*national law purposes."* *United States v. Alaska,* 503 U.S. 569, 589 n. 11, 112 S.Ct. 1606, 118 L.Ed.2d 222 (1992) (citing *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 441 n. 8, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989)) (emphasis added); *see also* 1 Thomas J. Schoenbaum, Admiralty and Maritime Law, § 2–14 n. 7, at 32 (2d ed.1994) (noting that the Proclamation "is effective ... only for foreign policy purposes"); Richard J. McLaughlin, *The Impact of the Extension of the U.S. Territorial Sea on Foreign Flag Vessels,* 2 Terr. Sea J. 91, 94 (1992) (quoting State Department representative's remark that "'the Proclamation affects the breadth of the territorial sea only for international purposes.'") (quoting Examination of the President's Proclamation Extending the Territorial Sea of the United States from 3– to 12–Miles, Hearings Before the Subcomm. on Oceanography and Great Lakes of the House Comm. on Merchant Marine and Fisheries, 101 st Cong., 1 st Sess. 65, at 5 (1989) [hereinafter House Hearings] ).[2] Because the Proclamation expressly states that it does not "alter" any "rights, legal interests or obligations" under federal law, an expansion of the U.S. territorial sea for international law purposes should not alter the breadth of the territorial seas for domestic purposes. As a corollary, the starting point of the "high seas" for the purpose of a statute employing that term should remain the same, unless Congress's purpose when including that term was linked to the international legal understanding of the breadth of the U.S. territorial sea.[3]

---

**2.** The State Department representative also observed that "the territorial sea was extended because 'national security and the practice of most nations made it desirable to change existing policy.'" McLaughlin, *supra,* at 94 (quoting House Hearings, at 5). In fact, within one week of the Proclamation's issuance, the U.S. Coast Guard effected the departure of two Soviet vessels from the newly expanded territorial sea. *See id.* at 95.

**3.** The majority claims that I "assume" that DOHSA's purpose is not linked to the international understanding of the breadth of the

U.S. territorial sea, and that I "ignore" Supreme Court cases, decided before DOHSA's enactment, which defined high seas as "international waters." *See ante* at 215. In fact, I make no such "assumption." Rather, I simply conclude that it is irrelevant to the outcome of this case whether Congress shared the international legal understanding of "high seas" as "non-sovereign waters," because Congress's only purpose in employing the phrase "high seas beyond a marine league" was to define and indicate a boundary line that ensured that state remedies would be

We have previously recognized this principle. In *Wheel*, a Second Circuit case glossed over by the majority, *see ante* at 213, this Court concluded that, because of the Proclamation's limiting language, the Proclamation did not affect the meaning of " 'beyond the territorial waters of the United States' " for the purposes of a 1994 amendment to the Gambling Ship Act, 18 U.S.C. §§ 1081–1084 (1994). *Wheel*, 166 F.3d at 498–99, 501.[4] *Wheel* found that "territorial waters" in § 1081 of the Gambling Ship Act referred to waters extending only three nautical miles from the U.S. coast, because Congress had not stated otherwise. *See id.* at 501, 502. That conclusion rested in part on the perception that the meaning of "U.S. territorial waters" for the purposes of the amendment to the Gambling Ship Act, which forbade gaming aboard American flag vessels in U.S. waters, was a matter of "federal" rather than international law. *See id.* at 499 & n. 1, 501.

Federal agencies have also recognized the distinction between the meaning of the U.S. territorial sea for the purposes of domestic law, on the one hand, and international law, on the other. The Federal Aviation Administration ("FAA") has observed, for example, that the Proclamation "extend[ed] the territorial sovereignty of the United States government, *for international purposes,* from 3 to 12 nautical miles from the U.S. coast," but did "not alter the geographical boundaries of the United States (i.e., national borders and territorial waters within 3 miles of the U.S. coast) for domestic purposes." Applicability of Federal Aviation Regulations in the Airspace Overlying the Waters Between 3 and 12 Nautical Miles from the United States Coast, 54 Fed.Reg. 264 (1989) (em-

phasis added). Accordingly, the FAA determined that the Proclamation did not itself redefine "territorial sea" within the Federal Aviation Act of 1958, 49 U.S.C. § 1301, and thus found it necessary to redefine "territorial seas" in certain parts of the implementing regulations to bring the United States into compliance with the Chicago Convention on International Civil Aviation, Dec. 7, 1944, 59 Stat. 1516, 15 U.N.T.S. 295. *See id.* The Coast Guard and the Environmental Protection Agency have similarly understood the Proclamation's effect. *See* Emergency Position Indicating Radio Beacons for Uninspected Vessels, 58 Fed.Reg. 13364 (1993) (observing that "Proclamation 5928 ... extended the territorial sea to twelve nautical miles ... for the purposes of international law; however, that Proclamation did not affect domestic law," and therefore concluding that the requirement, contained in 46 U.S.C. § 4102, that certain emergency equipment must be carried by uninspected vessels on the "high seas" still applied within the expanded territorial sea beyond one marine league from the coast) (Coast Guard); National Oil and Hazardous Substances Pollution Contingency Plan, 55 Fed.Reg. 8666 (1990) (observing that the Proclamation, given its limiting language, did not change the meaning of "territorial sea" for purposes of the National Contingency Plan) (Environmental Protection Agency).

Except for the district court and the majority in this case, every court to consider DOHSA's range of application since the Proclamation's issuance has found that DOHSA continues to apply in the disputed zone. The majority's efforts to discount these cases cannot alter the force of their consistent reasoning. The court in *Fran-*

---

preserved in state territorial waters—a purely domestic goal. *Supra* at 216. As discussed below, nothing in DOHSA's language, legislative history, or purpose indicates that Congress intended DOHSA's boundary line to be variable depending on changes in international law.

4. The phrase "beyond the territorial waters of the United States" in the Gambling Ship Act, 18 U.S.C. § 1081, is defined in 26 C.F.R. § 43.4472–1(e) (1994) as "those waters within the international boundary line between the United States and any contiguous foreign country or within 3 nautical miles ... from low tide on the coastline."

cis v. Hornbeck Offshore (1991) Corp., Civ. A. No. 96–608, 1997 WL 20740 (E.D.La. Jan.17, 1997), held that, because of its limiting language, the Proclamation did not affect DOHSA. See id. at *1 ("Proclamation 5928, by its own terms, does not alter DOHSA's application beyond one marine league from shore...."). Similarly, the court in Blome v. Aerospatiale Helicopter Corp., 924 F.Supp. 805, 814 (S.D.Texas 1996), aff'd, 114 F.3d 1184 (5th Cir.1997) (unpublished disposition), although recognizing that Proclamation 5928 extended the U.S. territorial sea to twelve nautical miles, concluded that DOHSA applied where a death occurred more than nine nautical miles from the Texas coast, beyond state waters but within the U.S. territorial sea.[5] As the majority recognizes, see ante at 214, numerous other courts, albeit in dicta, have stated that DOHSA applies in the disputed zone even after the issuance of the Proclamation. The case Yamaha Motor Corp. v. Calhoun, 516 U.S. 199, 207 n. 4, 116 S.Ct. 619, 133 L.Ed.2d 578 (1996), in which the Supreme Court observed that "[DOHSA] provides a federal claim for wrongful death occurring more than three nautical miles from the

shore of any State or Territory," should be added to the majority's long list.[6]

In sum, the weight of authority recognizes that the Proclamation changed the meaning of the U.S. territorial sea—and thus its complement the "high seas"—only for international law purposes. This understanding comports with both the Proclamation's limiting language and its principal purpose of protecting national security. See McLaughlin, supra note 1, at 95. When interpreting a domestic statute like DOHSA, therefore, we should not incorporate international concepts of territorial and high seas unless Congress specifically intended to import those concepts into the statute. Rather, we should follow the lead of the Wheel court, which found that "U.S. territorial waters" for purposes of the Gambling Ship Act extended only three nautical miles—and therefore that the high seas commenced at 12 nautical miles—because Congress had not stated otherwise. See Wheel, 166 F.3d at 501, 502.

The guidance of the Office of Legal Counsel ("OLC")[7] on determining the Proclamation's effect, if any, on the mean-

5. Although the majority apparently finds "more persuasive" the pronouncement in Triton Container Int'l Ltd. v. Compania Anonima Venezolana De Navegacion, Civ. Nos. 94–00055, 94–00063, 1995 WL 464484, at *3 (D.Guam, May 2, 1995) that "the three mile territorial limit is a vestigial concept," ante at 214 it should be noted that Triton did not in any way involve death on the high seas or elsewhere. Triton was a suit in admiralty "for reimbursement of the administrative expenses advanced by Triton for the preservation, safekeeping, and sale" of a certain vessel. Id. at *1.

6. The majority downplays Yamaha's observation on the basis that the Proclamation was never discussed in the Yamaha parties' briefs or at oral argument. See ante at 211, n. 17. Whatever the parties discussed, I assume the Supreme Court gives thought to the issues it chooses to address, even in dicta.

The majority also appears to misrepresent the issues and holding of Yamaha. In contrast to the majority's observations, neither side in Yamaha raised "a claim that DOHSA was the remedy for a death that occurred in

the waters of Puerto Rico." See ante at 211. If DOHSA's zone of application had been an issue in Yahama the above-quoted dicta would be binding precedent dispositive of this case. DOHSA was not at issue in Yamaha; rather, the question in Yamaha was whether state law (Puerto Rican Commonwealth law or Pennsylvania law) or federal common law remedies applied in Puerto Rico's three nautical mile territorial sea—a zone of waters in which DOHSA is indisputably inapplicable. See 46 U.S.C. App. § 761. The Court concluded that state remedies had "not been displaced by the federal maritime wrongful-death action recognized in Moragne v. States Marine Lines, Inc., 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970)." Yamaha, 516 U.S. at 202, 116 S.Ct. 619. Yamaha thus speaks to remedies in Puerto Rican territorial waters, which for the purposes of Yamaha were either Puerto Rico's or Pennsylvania's wrongful death remedies. See Yamaha, 516 U.S. at 216 n. 14, 116 S.Ct. 619.

7. The Office of Legal Counsel is an Office in the Department of Justice headed by an Assistant Attorney General. See 28 C.F.R. § 0.25.

ing of the territorial sea for the purposes of a particular statute is consistent with this view. According to the OLC, in determining whether the Proclamation affects a particular statute, the issue is whether Congress "intended" the statute to be affected by a change in the meaning of the U.S. "territorial sea *under international law*." Douglas W. Kmiec, *Legal Issues Raised by the Proposed Presidential Proclamation To Extend the Territorial Sea*, 1 Terr. Sea J. 1, 22 (1990) (opinion of OLC) (emphasis added.). The OLC suggests that the starting point in this analysis is the statutory language; if the language is ambiguous, analysis of the statute's legislative history and its structure and purpose is appropriate. *See id.* at 23. This analytical framework comports with the classical canons of statutory construction. *Compare Friends of the Earth v. Consolidated Rail Corp.*, 768 F.2d 57, 62–63 (2d Cir. 1985) (observing that the analytical starting point is the statute's plain language and that if the language is clear and unambiguous, the judicial inquiry ordinarily ends) *with Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 220–21, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986) (construing a DOHSA provision, where a plain language reading proved inconclusive, in light of DOHSA's legislative history, congressional purpose, and the "importance of uniformity of admiralty law"). An analysis of DOHSA under these interpretive guidelines compels the conclusion that DOHSA applies to the disputed zone.

B.  DOHSA's Language

DOHSA denotes its zone of application as "on the high seas beyond a marine league from the shore of any State, or the District of Columbia, or the Territories or dependencies of the United States." 46 U.S.C. App. § 761. The OLC suggests that where a statute includes only a boundary measurement (i.e., "three miles seaward from the coast"), or employs the term "territorial sea" and defines it as "three miles seaward from the coast," the statute does not "invoke the concept of the territorial sea" but merely denotes "an area that coincides with it." Kmiec, *supra*, at 22–23. According to the OLC, statutes incorporating such definitional language are unambiguously unaffected by the Proclamation, and further inquiry is unnecessary. *See id.*

Whether or not one accepts OLC guidance on interpreting congressional statutes, the OLC has hit on what I consider the only outcome-determinative ambiguity in § 761: whether by using the term "high seas" Congress intended to incorporate the international legal concept of high seas into the provision, or merely to denote a zone—defined as those waters "beyond a marine league" from the coast—that coincided with the starting point of the high seas at the time of DOHSA's enactment. The appellees and the majority frame the debate around an ambiguity in the statute that is not dispositive of this case—the question whether the term "high seas," as understood by the DOHSA Congress, referred to waters seaward of the three-mile line, or to waters seaward of the low-water mark. *See ante* at 201–02. In light of the considerable evidence favoring the former view, I agree with the majority that Congress probably understood "high seas" to mean waters outside state territorial seas. *See ante* at 209–10. However, this does not help to resolve the essential ambiguity in the statute that I have just identified.

The majority states that if Congress, by using the term "high seas" in DOHSA, meant to indicate "waters outside . . . state territorial waters, where no nation is sovereign, . . . the Proclamation would not change this definition," *ante* at 213–14, and from this concludes that the Proclamation's declaration of a U.S. territorial sea extending twelve nautical miles necessarily excluded DOHSA's application from the disputed zone. If the majority's observation settled the matter, however, it would mean, by analogy, that the Proclamation

affected virtually every domestic statute employing the term "U.S. territorial sea," because that term has always been understood to indicate all waters over which the United States has jurisdiction, and the United States, after issuance of the Proclamation, enjoys jurisdiction over waters reaching twelve nautical miles from its coast. Yet, as noted above, neither courts nor administrative agencies have understood the Proclamation to have such broad effect. The majority's error flows from its analytical method; like the OLC, I think the appropriate mode of analysis is to determine whether Congress intended to incorporate the international law concept of non-sovereign waters into the meaning of "high seas" when drafting DOHSA, or merely intended to denote a boundary line coinciding with the start of the high seas in that era.

The numerous courts that have applied DOHSA to foreign territorial waters intuitively understood that Congress intended the latter. In *Howard v. Crystal Cruises, Inc.*, 41 F.3d 527, 529, 531 (9th Cir.1994), for example, the court held that a death "within the territorial waters of a foreign state [Mexico] occurs on the 'high seas' *for purposes of DOHSA*." (Emphasis added.) Thus, the fact that a death occurred within waters controlled by another sovereign does not affect DOHSA's applicability. *Accord Azzopardi v. Ocean Drilling & Exploration Co.*, 742 F.2d 890, 892, 894 (5th Cir.1984) (permitting DOHSA claim for accident occurring in the English Channel); *Sanchez v. Loffland Bros.*, 626 F.2d 1228, 1230 n. 4 (5th Cir.1980); *Jennings v. Boeing Co.*, 660 F.Supp. 796, 803 (E.D.Pa. 1987), *aff'd,* 838 F.2d 1206 (3d Cir.1988); *Kuntz v. Windjammer "Barefoot" Cruises, Ltd.*, 573 F.Supp. 1277, 1280–81 (W.D.Pa. 1983), *aff'd,* 738 F.2d 423 (3d Cir.1984); *First & Merchants Nat'l Bank v. Adams*, 1979 A.M.C. 2860 (E.D.Va.1979), *aff'd in part, rev'd in part on other grounds,* 644 F.2d 878 (4th Cir.1981). This case law— from the Third, Fourth, Fifth, and Ninth circuits—has been cited as definitive by admiralty treatises. *See* 2 Benedict on Admiralty § 81(b) n. 21 (7th ed. rev.

1999) ("It appears to be settled that the term 'high seas' *within the meaning of DOHSA* ... includes the territorial waters of a foreign nation as long as they are more than a marine league away from any United States shore.") (emphasis added); 1 Thomas J. Schoenbaum, Admiralty and Maritime Law, § 8–2 at 469–70 (2d ed. 1994) ("[DOHSA applies] even [to] those killed in foreign territorial waters."). As appellees conceded at oral argument, these authorities cannot be reconciled with a holding that the DOHSA Congress intended to incorporate into the Act the international legal concept of the high seas as non-sovereign waters. The majority refuses altogether to address this issue, a tacit admission that reconciliation is difficult, if not impossible.

## C. Legislative History

As the majority observes, DOHSA was drafted to fill the void created by *The Harrisburg*, 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358 (1886), which held that no federal common law remedy existed for wrongful death at sea, and to eliminate the confusion caused by the Court's subsequent efforts to alleviate *The Harrisburg*'s harsh effects. *See ante* at 202–04. DOHSA's advocates, in the earliest report on the bill, stated that the bill was "designed to remedy this situation by giving a [federal] right of action for death," H.R.Rep. No. 63–160, at 2 (1913); *see id.* at 3 (same), and added that while the bill provided the exclusive remedy for deaths on the high seas, it left "unimpaired the rights under State statutes as to deaths on waters within the territorial jurisdiction of the States." *Id.* at 2. From the start, therefore, DOHSA's proponents sought to preserve state remedies in state territory.

Indeed, one of the questions the drafters initially confronted was whether DOHSA should be applicable to "*all navigable waters,* and thus supersede state statutes within their respective boundaries, or [should be] supplementary to state stat-

utes and apply only on waters not covered by any statute," i.e., the high seas. Robert M. Hughes,[8] *Death Actions in Admiralty*, 31 Yale L.J. 115, 117 (1921) (emphasis added). Because the latter solution was deemed superior, DOHSA was drafted to "cover[ ] only waters a marine league from the shore of a state, or waters within regions *where the federal government has exclusive jurisdiction.*" *Id.* at 119 (emphasis added); *see also Right of Action for Death on the High Seas: Hearing Before Subcomm. No. 2 of the Comm. on the Judiciary*, 64[th] Cong. 1[st] Sess. 11–12 (1916) [hereinafter 1916 Hearing] (statement of Robert M. Hughes) ("[The committee of the Maritime Law Association] came to the conclusion that ... the simplest bill and the one that would cause the least opposition would be a bill to recognize the State statutes as governing on the territorial waters of the State, and to make our bill simply apply where no bill applies at all now—that is, a marine league from shore.");[9] *Miles v. Apex Marine Corp.*, 498 U.S. 19, 25, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990) ("Congress did not extend DOHSA to territorial waters *because it believed state statutes sufficient* in those areas.") (citing *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 397–98, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970)) (emphasis

added); *Moragne*, 398 U.S. at 398, 90 S.Ct. 1772 (noting that Congress legislated only to the three-mile line because "that was the extent of the problem," and because Congress wished to ensure that the "solution of one problem would not create another by inviting the courts to find that the Act pre-empted the entire field, destroying the state remedies that had previously existed"); *id.* at 399–400, 90 S.Ct. 1772 (finding that DOHSA was confined to the high seas in order to preserve state remedies). *Compare* 14 Cong. Rec.1929 (1914) (statement of Rep. Cox) (noting that high seas are that part of the ocean where the "[s]tates have no jurisdiction") *with id.* (statement of Rep. McCoy) ("[T]he term 'high seas' refers to that part of the ocean outside of the 3–mile limit.")

Thus, the fact that DOHSA at the time of its drafting excluded U.S. territorial waters was irrelevant to Congress in establishing the three nautical mile boundary line. The only "concept" that mattered to DOHSA's drafters was the concept of the states' territorial seas. I have found no justification in the legislative history, and the majority has pointed to none, for carving out the three nautical mile zone other than to preserve state remedies (and the remedies of U.S. territories and dependencies[10]). More importantly, I think we can

---

**8.** Hughes was a member of the Maritime Law Association, which initiated the drafting of DOHSA. *See Right of Action for Death on the High Seas: Hearing Before Subcomm. No. 2 of the Comm. on the Judiciary*, 64th Cong. 1st Sess. 3 (1916); Hughes, *Death Actions in Admiralty*, at 116–17.

**9.** The desire to preserve state remedies may explain the differences in language between the versions of the bill from 1909–1915 and the 1916 version; Hughes referred to the latter in his above-cited statements before Congress. In the 1909–1915 versions, the bill applied to deaths occurring "on the high seas, the Great Lakes, or any navigable waters of the United States." H.R. 15810, 61st Cong. § 1 (1909); S. 6291, 61st Cong. § 1 (1910); H.R. 24764, 62d Cong. § 1 (1912); H.R. 6143, 63d Cong. § 1 (1913); H.R. 6143, 63d Cong. § 1 (1915). The 1916 version provided, however, that the bill applied to deaths

"beyond a marine league from the shore of any State, or on any navigable waters of the Panama Canal Zone, the District of Columbia, or the Territories or dependencies of the United States." S. 4288, 64th Cong. § 1 (1917). (In the 1919 version the phrase "or on any navigable waters of the Panama Canal Zone" was deleted, so that the final draft of § 761 carved out the three nautical mile belt seaward of the District of Columbia and the Territories and dependencies, as well as the states' territorial waters. The navigable waters of the Panama Canal were exempted from DOHSA coverage in 46 U.S.C. App. § 767.)

**10.** DOHSA also preserved the local remedies of U.S. territories and dependencies in their territorial waters. At the time the bill was passed, these entities, like the states, had local laws providing remedies for wrongful death and courts that administered those remedies.

safely conclude that if the U.S. territorial sea had exceeded three nautical miles in 1920, Congress would still have set DOHSA's boundary line "beyond a marine league" from the U.S. coast, because the decision in *The Harrisburg* left no remedy for death in any area outside state territorial waters.

For this reason, *Moragne*'s overruling of *The Harrisburg* does not affect our analysis. The DOHSA Congress could not have predicted this development which occurred several decades after DOHSA's passage. *Moragne*'s rejection of *The Harrisburg*'s rule precluding federal common law remedies for death at sea could not possibly have affected Congress' intent when drafting DOHSA, and it is the intent of the DOHSA Congress which is relevant to this discussion.

In short, when Congress inserted ‘the term "high seas" into DOHSA, Congress intended to incorporate a geographical boundary line—"the high seas beyond a marine league from the shore"—which preserved state remedies in state waters; Congress did not intend to import an international legal concept of U.S. federal sovereignty subject to change. 46 U.S.C. § 761. Nor could it have predicted that, decades later, *Moragne* would overrule *The Harrisburg*.

D. Revisiting DOHSA's Language in Light of the Legislative History

The logical endpoint of this analysis is that the language "beyond a marine league" is definitional, clarifying the geographical boundary line at which the "high seas" began. It was reasonable for Congress to inject as much clarity as possible

into DOHSA because, as the majority acknowledges, the starting point of the high seas was uncertain in that era. *See ante* at 205. Moreover, the statute contains no independent definitional section.

The majority invokes the "well-settled rule of statutory construction that 'courts should disfavor interpretations of statutes that render language superfluous,'" *Sprint Spectrum, L.P. v. Willoth*, 176 F.3d 630, 640 (2d Cir.1999) (quoting *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992)), to argue in favor of a different reading of the language "on the high seas beyond a marine league." Both the district court and the majority cite this principle in contending that the appropriate way to read § 761 is as introducing two independent criteria for DOHSA's applicability: The death must have occurred (1) on the high seas, and (2) beyond one marine league from the coast. *See In re Air Crash Off Long Island*, 1998 WL 292333, at *3; *ante* at 207. This reading does not make sense, however, because DOHSA's drafters perceived "high seas" and "beyond a marine league" functionally to mean the same thing—the outer border of the states' territorial seas—whatever uncertainty swirled around the meaning of high seas in that era. *See ante* at 206–07. Moreover, according to the majority's own interpretation of what Congress meant by "high seas," i.e. non-sovereign waters, *see ante* at 213–14, inserting the language "beyond a marine league" could be read as superfluous, because the United States indisputably exercised sovereignty over all waters within a marine league of its coast.

*See, e.g., The Schooner Robert v. Kekauoha*, 114 F. 849, 851–52, 854 (9th Cir.1902) (observing that the 1900 Act creating a government for the territory of Hawaii, then codified at 48 U.S.C. § 493, established that the laws of the republic of Hawaii would remain in force even after the 1898 transfer of sovereignty to the United States, and therefore finding that Hawaii's statutory remedy for wrongful death applied to a death occurring within three nautical miles of ‍the Hawaiian

shores; *The Harrisburg*'s denial of a remedy under general maritime law was irrelevant to the outcome). Even today, the Supreme Court equates "state territorial waters" and "territorial waters of U.S. territories" for the purposes of DOHSA. *See Yamaha*, 516 U.S. at 202, 216 & n. 14, 116 S.Ct. 619 (framing the issue as whether state law (although Puerto Rico is a Commonwealth or territory and not a state) or general federal maritime law applied in Puerto Rican territorial waters).

In the circumstances under which DOHSA was drafted, I submit that including the language "beyond one marine league" and "high seas" did not create surplusage. Even if it had, the DOHSA Congress expressly indicated its willingness to indulge in surplusage for the sake of clarity. *See* 59 Cong. Rec. 4486 (1920) (statement of Rep. Goodykoontz) ("Even if you treat [a] phrase as surplusage, it can do no harm, for the reason that that which is useless does not vitiate the useful."). Section 767, for example, was included in DOHSA because it reaffirmed an important element of § 761—that the statute would preserve state remedies. *See id.* at 4482–83 (statement of Rep. Montague) (noting that § 767, despite objections that it was "superfluous," was retained "out of an abundant caution, to calm the minds" of those who feared that DOHSA would oust state remedies.) Indeed, the majority recognizes that the DOHSA Congress found necessary this "superfluous" language. *See ante* at 208. Similarly, it seems particularly likely that, out of an abundance of caution, Congress would have found it important to include both the term "high seas" and the explicative language "beyond a marine league from the shore" to ensure that no confusion about DOHSA's application would arise.

Because of the state of the law at the time of DOHSA's passage, I also cannot agree with the majority and the district court that Congress understood "high seas flexibly to mean non-sovereign waters." *In re Air Crash Off Long Island,* 1998 WL 292333, at *8. No clear remedies existed for wrongful death beyond state territorial waters after *The Harrisburg,* a gap in the law that DOHSA was designed expressly to fill. *See ante* at 203–04. It seems therefore highly unlikely that Congress would have intended to create the risk that, at some future time, the border of the U.S. territorial sea would be expanded outwards, leaving the intermediate zone between the state and federal boundaries without a clear remedy. Consequently, the majority's suggestion that Congress

intended "beyond a marine league" to specify a "geographical boundary" and "high seas" to indicate "a political boundary subject to change" is implausible, not to mention entirely speculative. *Ante* at 207. This reading finds no support in the legislative history.

In sum, a review of the legislative history makes clear that Congress inserted the language "high seas" and "beyond a marine league" to establish firmly the boundary line at which DOHSA's application began, thus ensuring the preservation of state remedies in state territorial waters.

### E. Congressional Purpose

DOHSA's purpose is clear from the legislative history. However, I wish to respond to what I perceive as the majority's overstatement of congressional purpose to justify its holding. Specifically, the majority seems to suggest we should displace DOHSA with general federal maritime law in the disputed zone on the ground that the latter allows a more generous recovery. *See ante* at 209. The case law that the majority cites to support this proposition, however, although it supports the premise that the law should afford *a* recovery, does not suggest that it must be the most generous one. Justice Chase remarked, for example, in the *The Sea Gull,* 21 F. Cas. 909, 910 (D.Md.1865) (No. 12,-578), that "[t]here are [common law cases] in which it has been held that ... no redress can be had ... [for] the death of one through the wrong of another; .... [C]ertainly it better becomes the humane and liberal character of proceedings in admiralty to give than withhold the remedy."

DOHSA's drafters wished to provide *a* remedy, not the most generous remedy. In enacting DOHSA, Congress specifically decided to create a remedy for death in the disputed zone which granted only pecuniary damages. *See* 46 U.S.C. App. § 762. If Congress had wished to make that remedy more generous, it certainly

had the opportunity to reflect that in the statute.

F. Uniformity

Although the majority claims that its holding promotes uniformity, its position plainly undermines the important principle, emphasized by the Supreme Court in *Tallentire,* of "uniformity of admiralty law." *Tallentire,* 477 U.S. at 221, 106 S.Ct. 2485. The majority's solution creates four maritime zones governed by different law, whereas the existing regime encompasses only two. The applicable law in the majority's four zones would be: (1) zero to three nautical miles: state law and federal common law; (2) three to twelve nautical miles: federal common law; (3) beyond twelve nautical miles: DOHSA; (4) foreign territorial waters: ? (the majority leaves this open rather than confronting the abundant case law applying DOHSA in foreign territorial waters). Uniformity would be better promoted under the current two-zone regime: (1) zero—three nautical miles: state law and federal common law; (2) beyond 3 nautical miles: DOHSA.

I am also unconvinced that a satisfactory remedy would exist for deaths occurring in the disputed zone if we were to supplant DOHSA's application in that zone with general federal maritime law. In the zero to three nautical mile zone, state statutory and state common law remedies are available to supplement general federal maritime law, but this would not necessarily be the case in the disputed zone, where state law is inapplicable. The majority declines to address in even the most cursory fashion what law actually would apply in the TWA litigation, except to deny DOHSA's application. *See ante* at 215. It also declines to consider what remedies might be available to appellees if DOHSA does not apply in the disputed zone. *See ante* at 202 n. 5 (expressing no view as to whether appellees would be able to recover for loss of society, survivor's grief, pre-death pain and suffering, and punitive damages). In short, very complex legal questions, including conflict of law issues, arise from the majority's ruling supplanting DOHSA with general federal maritime law in the disputed zone.

The majority's solution also prevents certainty in the law. The boundaries of DOHSA's application will be in constant flux because of the majority's acceptance of the district court's position that Congress defined "high seas flexibly to mean non-sovereign waters." *In re Air Crash Off Long Island,* 1998 WL 292333, at *8. *See generally* W. Michael Reisman & Gayl S. Westerman, Straight Baselines in Maritime Boundary Delimitation (1992) (discussing nations' abuse of Article 7 of the United Nations Convention on the Law of the Sea [11] to claim increasingly larger territorial seas). Under international law, the boundary of the high seas is subject to constant change, whether because of the United States' unilateral actions, the unilateral decisions of other nations, or the introduction of new treaties.[12] In the long run, it would be infinitely simpler and wiser to adhere to the three nautical mile line established by the DOHSA Congress for the purpose of preserving the states' jurisdiction over their territorial seas, and to let Congress decide when and how it wishes changes in international boundaries to affect DOHSA.

---

11. *See* United Nations Convention on the Law of the Sea [UNCLOS], Dec. 10, 1982, art. 7(1), 1833 U.N.T.S. 3, 401 ("[T]he method of straight baselines joining appropriate points may be employed in drawing the baseline from which the breadth of the territorial sea is measured.").

12. *See e.g.,* UNCLOS, art. 7(4), 1833·U.N.T.S. 3, 401 ("Straight baselines shall not be drawn to and from low-tide elevations, unless lighthouses or similar installations which are permanently above sea level have been built on them...."). It is interesting to note that the states' coastal borders, on the other hand, have been fixed by the Submerged Lands Act at three nautical miles, *see* 43 U.S.C. § 1312 (1994), however the United States redraws its baselines for international purposes.

In sum, my answer to the interpretive question whether Congress intended DOHSA to be affected by a change in the meaning of the U.S. territorial sea under international law is a resounding no.

## CONCLUSION

Congress—and the President—have the opportunity to amend DOHSA to incorporate a more generous remedial scheme, just as they have the opportunity, if so inclined, to preclude DOHSA's application in the disputed zone. I have no desire to pre-empt the legislative process by reading DOHSA more broadly than the Proclamation dictates or than the DOHSA Congress intended. The appropriate remedial scheme for deaths occurring off the United States coast is clearly a legislative policy choice, which should not be made by the courts.[13] For the foregoing reasons, I respectfully dissent from the majority opinion, and I would reverse the district court's decision.

---

13. Currently before the President for signature is a bill that (1) alters DOHSA's remedial scheme by allowing compensation for nonpecuniary damages for deaths resulting from commercial aviation accidents; (2) declares DOHSA inapplicable to deaths occurring in the disputed zone if they resulted from commercial aviation accidents; and (3) sets the act's effective date as of July 16, 1996, one day prior to the TWA crash. See H.R. 1000, 106 th Cong. (2000).