**Audrey FLACK Plaintiff,**

v.

**FRIENDS OF QUEEN CATHERINE INC., Manuel Andrade Sousa, President of Friends of Queen Catherine and Individually and Tallix, Inc., Defendants.**

No. 99 CIV. 9930(SHS).

United States District Court,
S.D. New York.

April 19, 2001.

---

Barbara T. Hoffman, The Law Office of Barbara Hoffman, New York City, for Plaintiff.

Michael S. Oberman, Kramer, Levin, Naftalis & Frankel LLP, New York City, for Defendant Friends of Queen Catherine, Inc.

Robert D. Mercurio, Lane & Mittendorf, New York City, for Defendant Tallix, Inc.

## OPINION AND ORDER

STEIN, District Judge.

This case arises from a failed project to erect a large statue of Queen Catherine of Braganza, namesake of the borough of Queens in New York City, on a site on the East River overlooking Manhattan. Plaintiff Audrey Flack, the artist commissioned to create the statute, has brought suit against defendants Friends of Queen Catherine, Inc. ("FQC")—the non-profit organization managing the project—FQC's president, Manuel Andrade Sousa, and Tallix, Inc., the foundry where the statue was to have been built, asserting claims for violations of her rights pursuant to the Visual Artists Rights Act of 1990 ("VARA"), Pub.L. No. 101–650 (tit.VI), 104 Stat. 5089, 5128–33 (codified in various sections of 17 U.S.C.), the Copyright Act, 17 U.S.C. § 101 et seq., and the Lanham Act, 15 U.S.C. § 1501 et seq., as well as for breach of contract and, in the case of Tallix, tortious interference with contract.

Defendants FQC and Tallix have each moved to dismiss the Second Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that: (1) it fails to state a federal claim; (2) it fails to state any claim against Tallix; and (3) the Court should not exercise supplemental jurisdiction over Flack's state law claims against FQC. Flack has cross moved for a preliminary injunction enjoining defendants from, among other things, modifying or destroying certain sculptures and from infringing Flack's copyrights. Flack has also moved for

leave to amend her complaint to add a copyright registration number. For the reasons set forth below, defendants' motions are granted in part and denied in part, Flack's motion for leave to amend her complaint is granted, and Flack's motion for a preliminary injunction is denied.

## I. BACKGROUND

As to the motions to dismiss, the Court accepts the allegations in the complaint as true, as it must. *See Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994).

According to the complaint, Audrey Flack is a distinguished sculptor whose work has been widely collected over a 40-year career. Compl. ¶¶ 4–5. FQC is a not-for-profit corporation established in 1989 for the purpose of memorializing the life of Catherine of Braganza, Princess of Portugal and Queen of England in the mid-seventeenth century and namesake of the borough of Queens. *Id.* ¶ 6. In 1992, FQC undertook to create a monument to Queen Catherine to be installed at a prominent place within the Hunters Point Redevelopment Project in Queens. *Id.* ¶ 9.

FQC organized an international competition to select an artist to create the monument, for which Flack created a 22″ sculpture entitled "Queen Catherine of Braganza." *Id.* ¶ 10. Based on that sculpture, Flack was commissioned to further design and supervise the fabrication and installation of a 35′ bronze sculpture of Queen Catherine on a site—donated by the Port Authority of New York and New Jersey and the Queens Development Corporation—on the East River overlooking Manhattan. *Id.*

Flack began work immediately based on the verbal agreement of Sousa that a contract would be forthcoming and that Flack would receive $300,000. *Id.* ¶ 11. Flack and FQC did not memorialize the terms of their agreement, however, until June 24, 1995 (the "Flack–FQC Agreement"). *Id.* ¶¶ 12, 14. The Flack–FQC Agreement provides for a design fee of not $300,000, but of only $125,000. *Id.* ¶¶ 12–13.

Approximately a year later, in June 1996, FQC entered into an agreement with defendant Tallix, Inc. (the "Tallix–FQC Agreement"), pursuant to which Tallix would fabricate four bronze sculptures honoring Queen Catherine—a 22″ sculpture (Phase I), a 44″ sculpture (Phase II), a 10′ sculpture (Phase III), and a 35′ sculpture (Phase IV). *Id.* ¶¶ 8, 21 & Ex. C. Flack is not a signatory to the Tallix–FQC Agreement, although she is expressly named in it as the artist commissioned to "design and advise with respect to the fabrication and installation of a 35′ bronze sculpture honoring Queen Catherine of Braganza." *Id.* ¶ 23.

Flack eventually completed the first three phases of the project at Tallix, including creating a 22″ bronze maquette[1] reproduced from the 22″ commission-winning sculpture, a 44″ bronze sculpture and a 10′ bronze sculpture. *Id.* ¶ 25 & Ex. B. Each sculpture was apparently created as follows: First, Flack designed and created, using modeling techniques,[2] a clay sculpture of the statue. Next, molds were made from the clay sculpture using wax. Finally, the wax molds were used to cast the image in bronze. *See Id.* Exs. B & C.

---

1. A maquette is a small-scale model of an intended larger work in which the ideas for the larger work can be tried and tested. *See* The Complete Guide to Sculpture, Modeling and Ceramics Techniques and Materials 15 (Brian Midgley ed. 1986) ("Complete Guide").

2. Modeling is a process where the sculptor builds up the form in a soft, malleable material, such as clay or wax, over a minimal supporting structure of rigid material. *See* Complete Guide at 9.

During 1996 and 1997, Flack began work on the fourth phase of the project by beginning work, in clay, on the 35′ sculpture. *Id.* ¶ 26. She designed and supervised the construction of, and directly worked on, the 35′ clay enlargement of the face, and she also sculpted the curls, hands, body, ornaments and lace collar. *Id.* Flack also designed and supervised the construction of the skirt as required by the Flack–FQC Agreement. *Id.* On November 8, 1997, FQC approved the Queen Catherine sculpture and authorized the creation of molds and casting. *Id.* ¶ 30.

By this time, however, the project had generated a certain amount of controversy on the basis that Queen Catherine and her family had allegedly profited from the slave trade and that the project had allegedly not been subjected to the proper review process. *Id.* ¶¶ 32–33. As a result, Queens Borough President Claire Shulman declared in early February 1998 that the East River site would no longer be available for the statue. *Id.* ¶ 36.

In March 1998, Tallix, concerned about FQC's ability to take delivery of the statue in light of the loss of the East River site, terminated further work on the project pending assurances regarding FQC's ability to proceed. *Id.* ¶ 37 & Ex. G. Because those assurances were not forthcoming, Tallix terminated its agreement with FQC on May 14, 1998, pursuant to paragraphs 17a(iii) and 17a(v) of the Tallix–FQC Agreement. *Id.* Exs. C, G.

FQC and Tallix eventually settled their differences and entered into a new agreement on January 29, 1999 (the "Modified Agreement"). That agreement provided, among other things, that Tallix was to assemble and finish the 35′ bronze sculpture in sections suitable for shipping. *Id.* Ex. H ¶ 9. The Modified Agreement also provided that "In all matters dealing with casting and finishing of the Sections and Armature, Tallix will deal exclusively with the President of FQC ... as the only person[ ] authorized by FQC to represent FQC with respect to this project." *Id.* The Modified Agreement did not mention Flack. *Id.* Ex. H. Indeed, from March 1998 through the present, Flack has not been permitted to supervise or have final approval of the fabrication of the 35′ bronze sculpture. *Id.* ¶ 42.

Following the execution of the Modified Agreement, Tallix apparently began preparing to complete the 35′ bronze statue. In late March 1999, however, Flack discovered, while at Tallix working on another project, that the waxes and molds drawn from the 35′ clay sculpture had been damaged, and that, therefore, new molds were required. *Id.* ¶¶ 45, 47.

The sculpture of the head of the 35′ statue had been placed outdoors in what the complaint refers to as the Tallix "garbage dump," and, allegedly, while there, the face of the sculpture had been damaged. *Id.* ¶¶ 49, 52. Because the damaged face could not be used to replace the damaged waxes and molds, it was necessary to reconstruct the clay face in order to develop new molds. *Id.* ¶ 52. Although Flack offered to resculpt the face for an additional fee, Tallix, at the suggestion of FQC, hired David Simon—one of Flack's assistants—to resculpt the face. *Id.* ¶¶ 53, 55 & Exs. I, J.

Simon allegedly lacked the skills necessary to resculpt the face, and he was not trained in conservation of sculpture. *Id.* ¶ 54. According to the complaint, the result of Simon's work was a "distorted, mutilated model" in which, among other matters, the nose, nostrils, eyes and lips are uneven and the wrong size. *Id.* ¶ 57.

Notwithstanding these distortions, in August 1999, Sousa authorized Tallix to "go ahead with the mold and casting of the face of the Queen Catherine statue recently rebuilt by artist David Simon," *id.* ¶ 58

& Ex. M, and Tallix responded that the bronze head would be ready to ship on October 30, 1999, and that all body parts would be ready to ship by the end of 1999, *id.* ¶ 61 & Ex. N.

Flack commenced this action in September 1999, and this Court issued a temporary restraining order prohibiting defendants from casting the altered head in bronze and directing defendants to show cause why they should not be preliminarily enjoined from taking any action to alter, deface, modify or mutilate Flack's art work located on Tallix's property. After defendants agreed "not to proceed with casting the clay face in bronze" (Letter from Barbara Hoffman to the Court dated December 2, 1999; Letter from Michael S. Oberman to the Court dated December 1, 1999), Flack's motion for a preliminary injunction was dismissed as moot. *See* Order dated December 2, 1999.

As noted above, defendants have now moved to dismiss the Second Amended Complaint, and Flack has cross-moved for a preliminary injunction prohibiting defendants from, among other things, modifying or destroying the 35′ clay sculpture and from infringing Flack's copyrights.

## II. DISCUSSION

When deciding a motion to dismiss a complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must accept all of the well-pleaded facts as true and draw all reasonable inferences from those allegations in favor of the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). A complaint will survive a motion to dismiss unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle [her] to relief." *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

## A. *The VARA Claims*

The Visual Artists Rights Act of 1990 ("VARA"), Pub.L. No. 101–650 (tit.VI), 104 Stat. 5089, 5128–33 (codified in various sections of 17 U.S.C.), grants authors of certain works of visual arts three rights: the right of attribution, the right of integrity and, in the case of works of visual art of "recognized stature," the right to prevent destruction. *Carter v. Helmsley–Spear, Inc.,* 71 F.3d 77, 83 (2d Cir.1995). The right of integrity includes the right to prevent any intentional distortion, mutilation, or other modification of an author's work of visual art that would be prejudicial to the artists's honor or reputation. 17 U.S.C. § 106A(a)(3)(A). Modifications resulting from "the passage of time or the inherent nature of the materials", however, are excluded from the scope of section 106A(a)(3)(A), *id.* § 106A(c)(1), as are modifications that are the result of conservation, unless the modification is caused by gross negligence, *id.* § 106A(c)(2). Copyright registration is not required to bring an action for infringement of the rights granted pursuant to VARA. *Id.* § 411.

Analysis of whether a particular work falls under VARA's protective umbrella is a two step process. *Carter,* 71 F.3d at 84. First, it must meet the statutory definition of a "work of visual art," which includes "... a sculpture, existing in a single copy ...." 17 U.S.C. § 101; *see Carter,* 71 F.3d at 84. Second, it cannot fall within one of the statutory exclusions—i.e., it cannot be "any poster, map, globe, chart, technical drawing, diagram, model, applied art, motion picture or audio-visual work, book, magazine, newspaper, periodical, data base, electronic information service, electronic publication, or other similar publication." 17 U.S.C. § 101; *see Carter,* 71 F.3d at 84.

Flack asserts three distinct VARA claims: "i) a claim for the partial destruc-

tion of a work of visual art of 'recognized stature' by virtue of Tallix's placement of the Clay Sculpture in the 'garbage dump'; ii) the hiring of David Simon by Tallix to reconstruct the face of the Clay Sculpture; [and] iii) the approval of the Simon modification and authorization by FQC to cast in bronze without the approval of the artist." Pl.'s Mem. at 18. Defendants respond that: (1) the clay sculpture is not a "work of visual art" pursuant to VARA; (2) VARA does not grant the artist rights in as-yet uncreated works such as the 35′ bronze; and (3) the modifications made to the clay sculpture were not violative of VARA because they were the result of the passage of time or the inherent nature of the materials or were the result of conservation efforts. Each of defendant's arguments will be addressed in turn.

■ As an initial matter, defendants contend that because the ultimate aim of the project was a 35′ bronze statue, only that statue, and not any intermediate work, is eligible for VARA protection. The statutory definition of "a work of visual art", however, does not exclude an otherwise qualifying work simply because it is part of a larger project. *See* 17 U.S.C. § 101. Thus, regardless of its status as an impermanent or intermediate stage in the creation of the 35′ bronze, the 35′ clay sculpture falls under VARA's protection if it meets the statutory definition of "a work of visual art." [3]

The defendants do not seriously dispute that the head of the 35′ clay is a "sculpture, existing in a single copy." Thus, the Court finds that the 35′ head meets the positive definition of "a work of visual art."

*See* 17 U.S.C. § 101; *Carter,* 71 F.3d at 84. Defendants contend, however, that the clay head, as a "model" for the 35′ bronze, falls into a category specifically excluded from the definition of "a work of visual art." Flack agrees that the clay head is a "model," but contends that it is not the type of model Congress included in the list of statutory exclusions. Resolution of the issue, then, depends upon the proper interpretation of the word "model" as used in the exclusionary portion of the definition of "a work of visual art" in 17 U.S.C. § 101.

Statutory interpretation begins with the language of the statute itself, and individual words in a statute are assumed to carry their ordinary, common-sense meaning. *Greenery Rehabilitation Group, Inc. v. Hammon,* 150 F.3d 226, 231 (2d Cir.1998). If that meaning is unambiguous, "judicial inquiry should end, and the law interpreted according to the plain meaning of its words." *Aslanidis v. United States Lines, Inc.,* 7 F.3d 1067, 1073 (2d Cir.1993). Where a statute is textually ambiguous, however, "legislative history and other tools of interpretation beyond a plain reading of the statute's words [may] be utilized to shed light on verbiage that is unclear." *Id.; see also In re Air Crash Off Long Island, New York, On July 17, 1996,* 209 F.3d 200, 202–03 (2d Cir.2000).

Meanings of the word "model" range from "a small copy or imitation of an existing object, as a ship, building, etc., made to scale" to "a preliminary representation of something, serving as the plan from which the final, usually larger, object is to be constructed" to "a piece of sculpture in wax or clay from which a finished work in

---

**3.** The defendants emphasize their belief that the various parts of the 35′ clay sculpture were never put together into a single unitary sculpture. *See* FQC Mem. at 8 & n. 2. Whether the sculpture was ever put together is irrelevant, however, as each individual sculptured part could be analyzed as a separate work for

purposes of VARA. *Cf. Carter v. Helmsley–Spear, Inc.,* 861 F.Supp. 303, 315–16 (S.D.N.Y.1994) (analyzing different components of a sculpture separately), *aff'd in relevant part, rev'd in part,* 71 F.3d 77 (2d Cir. 1995).

bronze, marble, etc. is to be made." Pl.'s Mem. at 9 (quoting Webster's New World College Dictionary); *see also* American Heritage College Dictionary 876 (3d ed.1997). Thus, the term "model" is ambiguous for the purposes of this case, because the clay sculpture is not "a small copy or imitation of an existing object," but is "a piece of sculpture in wax or clay from which a finished work in bronze ... is to be made." Where, as here, each party relies on a reasonable, but contradictory, meaning of a statutory term, resort to interpretive tools such as legislative history is appropriate. *See United States v. Dauray*, 215 F.3d 257, 260–64 (2d Cir. 2000); *In re Air Crash*, 209 F.3d at 202–03.

As defendants correctly point out, the legislative history evinces an intent to pass narrowly tailored legislation. *See, e.g.*, H.R.Rep. No. 101–514, at 11 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6915, 6918; *The Visual Artists Rights Act of 1989: Hearings on H.R. 2690 Before the Subcommittee on Courts, Intellectual Property, and the Administration of Justice of the House Committee on the Judiciary*, 101st Cong. 19 (1989) (testimony of Rep. Edward Markey); 136 Cong. Rec. E3716–17 (1990) (statement of Rep. Moorhead). The legislative history is completely devoid, however, of any indication of the meaning of the word "model." Indeed, when the exclusionary portion of the definition of "a work of visual art" is discussed at all, the distinction emphasized is that between fine art, on the one hand, and movies, books, newspapers, magazines, and other creative works on the other. *See, e.g.*, H.R.Rep. No. 101–514, at 8–9, *reprinted in* 1990 U.S.C.C.A.N. 6915, 6917–18 (discussing the differing concerns of visual artists and "directors, screenwriters, and other creative contributors to motion pictures"); 136 Cong. Rec. E3716 (1990)

(statement of Rep. Moorhead) (noting that in drafting the legislation, Congress had erected a "broad wall ... against the legislation spilling over and affecting the producers of books, magazines, motion pictures and other creative works."); 136 Cong. Rec. H8271 (1990) (statement of Rep. Markey).

■ House Report 101–514 does contain, though, the following precatory language:

> The courts should use common sense and generally accepted standards of the artistic community in determining whether a particular work falls within the scope of the definition. Artists may work in a variety of media, and use any number of materials in creating their works. Therefore, whether a particular work falls within the definition should not depend on the medium or materials used.

H.R. Rep. 101–514, at 11, *reprinted in* 1990 U.S.C.C.A.N. 6915, 6921. Thus, the Court will look to the "standards of the artistic community" to determine whether the "models" at issue here are excluded from the definition of "a work of visual art."

■ In the artistic community, "models" such as the clay sculpture are considered works of art in their own right. Compl. ¶ 48; *see also* Complete Guide at 15.[4] Models of large sculptures are frequently exhibited to the public. *See, e.g.*, Dallas Museum of Art, Henry Moore: Sculpting the 20th Century, *at* http://www.dmart.org/moore/exhibinfo.htm (visited April 18, 2001); Vivian Letran, *His Sculpture Is a Glass Act: Howard Ben Tre Casts Pieces as If They Were Bronze and Creates Dense, Sturdy, Stone–Like Shapes That Speak to Interior, Exterior Issues in Mid–Career*, Los Angeles Times, Feb. 12,

---

4. The *Compete Guide* is cited in footnote 26 of House Report 101–514.

2001, at B6, *available at* 2001 WL 2460596; Mike Daniel, *Tom Wesselmann,* Dallas Morning News, Feb. 9, 2001, at 55, *available at* 2001 WL 11660952. "Common sense" and the "generally accepted standards of the artistic community," then, suggest that such works are not "models" as used in the exclusionary portion of the definition of "a work of visual art."

The suggestion is strengthened because a contrary interpretation would lead to an absurd result. *See, e.g., Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 575, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."); *Dauray,* 215 F.3d at 264. The "preliminary" work of painters—drawings and sketches—is unquestionably covered by VARA. Indeed, according to House Report 101–514, even certain photographic negatives are covered. H.R. Rep. 101–514, at 11, *reprinted in* 1990 U.S.C.C.A.N. 6915, 6921. Thus, if "model" were construed to cover the preliminary work of sculptors, then sculptors would enjoy less protection than photographers and painters, even though all three types of artists—without distinction between them—were the intended beneficiaries of VARA.

Accordingly, the Court holds that the clay sculpture meets VARA's definition of "a work of visual art," and turns to the question of whether the acts Flack complains of constitute violations of VARA.

1. *Flack's first VARA claim; Partial destruction of a work of visual art of "recognized stature"*

■ Flack's first VARA claim is based on the placing of the head of the 35′ clay sculpture outdoors in what the complaint piquantly calls the Tallix "garbage dump." *See* Compl. ¶ 49. Exposed to the elements, the clay allegedly deteriorated, ne-

cessitating the repair work for which David Simon was hired. *See id.* ¶ 49 & Ex. J. Flack contends that placing the head outdoors constituted a "grossly negligent" or "intentional" modification within the meaning of VARA.

As defendants point out, however, VARA does not provide a means of enjoining or obtaining damages due to modifications resulting from "the passage of time or the inherent nature of the materials." *See* 17 U.S.C. § 106A(c)(1). This is true even if the modification is caused by gross negligence. *Compare* H.R. 2690, 101st Cong. (June 20, 1989) (VARA as originally introduced, with modifications resulting from the passage of time not actionable *unless* caused by "gross negligence in maintaining or protecting the work."), *with* 17 U.S.C. § 106A(c)(1) (VARA as passed without reference to such negligence in the "passage of time" exception). Moreover, there is no allegation in the complaint that defendants intentionally or directly damaged the clay face, and the bald and unsupported allegation that defendants "willful[ly]" placed the head outside (Compl.¶¶ 49, 71) is insufficient to survive a motion to dismiss, *see Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996), particularly where, as here, the allegedly intentional action—damaging the head—would be contrary to any conceivable interest of defendants.

To the extent that Flack contends that the head was "destroyed" through defendants' gross negligence, *see* 17 U.S.C. 106A(a)(3)(B), the Court rejects her argument. The complaint and the photographs of the head annexed to it unambiguously show that although the face was damaged, the head has not been destroyed and is capable of being repaired. Indeed, the complaint describes Flack's own offers to repair it. *See* Compl. ¶ 55. Accordingly, Flack's VARA claim based on the placing

of the head of the 35' clay sculpture in the Tallix "garbage dump" is dismissed.

### 2. *Flack's second VARA claim: The resculpting by David Simon*

■ Flack's second VARA claim is based on David Simon's work to resculpt the face of the clay sculpture, which allegedly resulted in a "distorted, mutilated" clay model. Compl. ¶ 57. Flack argues that the result was a "grossly negligent" or "intentional" modification within the meaning of VARA. Defendants respond that Simon was hired only to repair—not modify—the clay face, and, thus, his work on the clay face constituted efforts at "conservation" specifically excepted by 17 U.S.C. § 106A(c)(2) from the modifications for which an artist is entitled to prevent or recover damages.

The Court agrees that Simon's work was an effort at conservation. *See, e.g.* Compl. Ex. J. But not all such efforts are excepted from VARA liability. Section 106A(c)(2) provides that "[t]he modification of a work of visual art which is the result of conservation ... is not a destruction, distortion, mutilation, or other modification described in section (a)(3) *unless the modification is caused by gross negligence.*" 17 U.S.C. § 106A(c)(2) (emphasis added).

Flack's complaint contains sufficient allegations that, if proven, could support an inference that the hiring of Simon was grossly negligent. Flack avers that Simon was a mere "assistant" who was not trained in conservation, was not competent to perform work without her supervision, had not previously undertaken unsupervised work, and had little knowledge or experience in creating a monumental sculpture that would be viewed from the ground. Compl. ¶ 54. The result of his repair work was a "distorted, mutilated" model. *Id.* ¶ 57. Those allegation are sufficient to enable that claim to survive the motion to dismiss. Accordingly, defen-

dants' motion to dismiss is denied as to Flack's VARA claim based on the work of David Simon.

### 3. *Flack's third VARA claim: The authorization to cast in bronze without her approval*

■ Flack's third VARA claim is that FQC improperly approved the Simon modification and authorized the casting in bronze without the approval of the artist. *See* Pl.'s Mem. at 18. Flack contends that VARA grants artists the right to "compel the commissioning party to complete and maintain" an unfinished work in accordance with the artist's wishes. *Id.* at 17. In contrast to Flack's first two VARA claims, this claim seeks to protect the integrity of an indisputably uncompleted work—the 35' bronze.

The Court agrees with defendants that the artist cannot maintain such a claim pursuant to VARA. As Judge Edelstein explained in denying a similar claim,

> VARA mandates preservation of protected art work. It does not mandate creation. Nothing in the statute compels defendants to allow plaintiffs to engage in further creation. Contrary to plaintiff's assertion, defendants' refusal to permit plaintiffs to 'finish' the Work does not constitute 'distortion, mutilation, or other modification' under 17 U.S.C. § 106A(a)(3)(A).

*Carter v. Helmsley–Spear, Inc.,* 861 F.Supp. 303, 329 (S.D.N.Y.1994), *aff'd in part, rev'd in part,* 71 F.3d 77 (2d Cir. 1995). VARA most decidedly does not cover works that do not yet exist. Thus, Flack's third VARA claim must be dismissed.

### B. *The Copyright Claims*

There are two elements of a claim for copyright infringement: ownership of a valid copyright, and copying of those ele-

ments of the work that are copyrightable. *See Fonar Corp. v. Domenick,* 105 F.3d 99, 103 (2d Cir.1997); *Key Publications, Inc. v. Chinatown Today Publ'g Enters., Inc.,* 945 F.2d 509, 514 (2d Cir.1991). In this case, Flack possesses a copyright registration for the 35′ clay sculpture, Compl. ¶ 79 & Ex. O,[5] which is presumptively valid at this stage of the litigation, *see Fonar,* 105 F.3d at 104. The gravamen of Flack's copyright claim is that Simon's rebuilding of the clay face by using pictures of the original constituted the infringing creation of a derivative work or reproduction. Compl. ¶ 80.

Defendants do not dispute that Simon copied Flack's work. Instead, they contend that (1) if the copying was a reproduction, then it was authorized under a provision of the Flack–FQC Agreement that designates both Flack and Tallix as the entities "responsible" for creating the 35′ "enlargement"; and (2) if the copying was so imprecise as to constitute the creation of a derivative work, then it was authorized under another provision of the Flack–FQC Agreement that grants FQC an "exclusive, irrevocable license ... to use the Art Work in furtherance of its not for profit purposes, including ... the creation of derivative works and the reproduction ... of the Art Work into souvenir ... items such as ... small replicas and models in mediums such as plastic, plaster or bonded bronze (excluding brass or bronze and not exceeding 15″ in height, including the dome)" (Compl.Ex. B). Neither argument can prevail on a motion to dismiss.

Interpretation of an agreement purporting to grant a copyright license is a matter of state contract law. *See, e.g., Bourne v. Walt Disney Co.,* 68 F.3d 621, 626–28 (2d Cir.1995). By its terms, the Flack–FQC Agreement is governed by the laws of New York. Compl. Ex. B Art. 14.

In New York, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the contract's language. *See Terwilliger v. Terwilliger,* 206 F.3d 240, 245 (2d Cir. 2000) (quoting *Cruden v. Bank of New York,* 957 F.2d 961, 976 (2d Cir.1992)); *Breed v. Insurance Co. of North America,* 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 355, 385 N.E.2d 1280, 1282 (1978). An unambiguous contract provision must be construed by the court, and not a jury, without consideration of matters extrinsic to the agreement. *See Terwilliger,* 206 F.3d at 245; *Teitelbaum Holdings, Ltd. v. Gold,* 48 N.Y.2d 51, 56, 421 N.Y.S.2d 556, 559, 396 N.E.2d 1029, 1032 (1979). Where a contractual term is clear and unambiguous, a court may neither rewrite the term under the guise of interpretation nor "redraft the contract to accord with its instinct for the dispensation of equity upon the facts of a given case." *See Terwilliger,* 206 F.3d at 245. Moreover, the court must consider the entire contract and reconcile all parts of, if possible, to avoid an inconsistency. *See id.; Laba v. Carey,* 29 N.Y.2d 302, 308, 327 N.Y.S.2d 613, 618, 277 N.E.2d 641, 644 (1971). "Effect and meaning must be given to every term of the contract, and reasonable effort must be made to harmonize all of its terms." *Reda v. Eastman Kodak Co.,* 233 A.D.2d 914, 915, 649 N.Y.S.2d 555, 557 (4th Dep't 1996).

The express language of section 6.1(a) specifically excludes from the rights granted to FQC the right to make reproductions of Flack's work "exceeding 15″ in height." Thus, the designation of Tallix as an entity "jointly responsible" for the "enlargement" stage of the project does not,

---

**5.** Defendants have not opposed Flack's motion for leave to amend her complaint to add an additional Copyright registration number, and the Court grants the motion in the interests of justice pursuant to Rule 15(a) of the Federal Rules of Civil Procedure.

as defendants contend, contain an implied authorization to copy Flack's work. *Cf. North Star Contracting Corp. v. City of New York*, 203 A.D.2d 214, 215, 611 N.Y.S.2d 11, 12 (1st Dep't 1994) ("[A] court will not make an inference of any implied agreement which is destructive of[ ] the express terms of the parties' contract.").

■ The Court also rejects defendants' contention that the Flack–FQC Agreement grants FQC a license to create a modified 35' sculpture as a "derivative" work. While section 6.1(a) does provide that FQC is licensed to create derivative works, article 11 provides that FQC may complete the 35' bronze on its own only in the event the agreement is terminated.[6] It is well-settled that "[i]f there is an inconsistency between a general provision and a specific provision of a contract, the specific provision controls." *Bank of Tokyo–Mitsubishi, Ltd. v. Kvaerner a.s.*, 243 A.D.2d 1, 8, 671 N.Y.S.2d 905, 910 (1st Dep't 1998). Accordingly, the Court concludes that section 6.1(a) does not grant FQC a license to create a modified 35' sculpture otherwise violative of Flack's copyright rights.

■ Defendants also argue that even if they infringed Flack's copyright, she cannot recover statutory damages or attorney's fees because the alleged infringement occurred before the copyright was registered and more than three months after first publication of the work. *See* 17 U.S.C. § 412. Flack acknowledges that the infringement took place outside the statutory period, but alleges that FQC breached its obligation under the Flack–FQC Agreement to register the copyright in her name. If Flack establishes that FQC breached an obligation to timely register the copyrights, she may attempt to prove the amount of statutory damages and attorney's fees she would otherwise

have been entitled to as damages for such breach. Alternatively, she may prove actual damages for copyright infringement. Defendants motion to dismiss is denied as to the copyright claims.

### C. The Lanham Act Claim

The gravamen of Flack's Lanham Act claim is that because Flack has been publicly associated with the Queen Catherine project, the display of a statute with a distorted face would result in that allegedly inferior work being associated with Flack, thus negatively impacting the market for her works. The defendants have agreed, however, not to complete a statue using the distorted face. FQC Mem. at 20–21. Thus, argue defendants, Flack has not and cannot allege that a misleading statue will be used in interstate commerce. Flack acknowledges defendants' agreement, Pl.'s Mem. at 24–25, but urges that defendants' failure to promise that they will not create another "misleading" statue saves her Lanham Act claim.

"Bald and conclusory" assertions that defendants are preparing to distribute allegedly misleading goods or advertisements "some time in the future" are insufficient to state a cause of action under the Lanham Act. *Vitale v. Marlborough Gallery*, No. 93 Civ. (PKL) 6276, 1994 WL 654494, at *7 (S.D.N.Y. July 5, 1994). A complaint alleging only that defendants have not promised to refrain for all time from sending unspecified misleading goods in interstate commerce presents even stronger grounds for dismissal. Flack's Lanham Act claim is dismissed.

### D. The Breach of Contract Claims Against FQC

FQC's only argument for dismissal of Flack's breach of contract claims against it

---

**6.** Because defendants do not argue on this motion that they were proceeding to complete the statue pursuant to article 11, the Court need not consider at this time Flack's argument that the right to complete attaches only in the event of the artist's death or disability.

is that if Flack's federal claims are dismissed, the Court should decline to exercise supplemental jurisdiction over the remaining state law claims. Because the Court is denying defendants' motion to dismiss as to certain federal claims, FQC's motion to dismiss the remaining state law claims against it is denied.

### E. The Breach of Contract Claims Against Tallix

■ Tallix advances two arguments for dismissal of Flack's breach of contract claims against it. First, Tallix argues that Flack has not pled facts to show that she was an intended third-party beneficiary of the Tallix–FQC Agreement. Second, Tallix contends that even if Flack were a third-party beneficiary of the Tallix–FQC Agreement, she cannot recover because Tallix did not breach any obligation to FQC.

To state a third-party beneficiary claim under New York law, a plaintiff must plead facts to establish that it is an "intended" beneficiary of a contract and not merely an "incidental" beneficiary. *See Septembertide Publ'g. B.V. v. Stein and Day, Inc.*, 884 F.2d 675, 679 (2d Cir.1989) (citing *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 66 N.Y.2d 38, 44–45, 495 N.Y.S.2d 1, 4–6, 485 N.E.2d 208, 211–13 (1985)); *IBS Ketel, Ltd. v. Hanil Bank, Korea*, No. 98 Civ. 3507 DC, 1999 WL 639696, at *1 (S.D.N.Y. Aug. 23, 1999) (same). A beneficiary is an intended beneficiary if "recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and ... the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." *Muhlrad v. Mitchell*, No. 96 Civ. 3568, 1997 WL 182614, at *5 (S.D.N.Y. Apr. 14, 1997) (quoting Restatement (Second) of Contracts § 302(1)). In determining whether a party is a third-party beneficiary, a court should look first at the contract's language, and then, if appropriate, to the surrounding circumstances. *Septembertide*, 884 F.2d at 679; *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 988 F.Supp. 367, 371 (S.D.N.Y.1997); *Muhlrad*, 1997 WL 182614, at *6.

The FQC–Tallix Agreement contains several provisions referring to Flack's role in the project:

- "The Company [Tallix] will provide reworked waxes of each molded section *for the Artist's approval* prior to casting. The complete wax figure will not be assembled, but will temporarily held in an assembled state *for the Artist's viewing.*"

- "Using the 10′ unfinished plaster model, the Company will fabricate a 35′ enlargement, *making such changes in scale and proportion as the Artist may judge necessary* .... The head and hands will be enlarged in plasteline using a 'pantograph' machine. *These sections will be medium scraped ready for the Artist to finish model prior to molding and not removed from the pantograph machine until medium scraping has been reviewed and approved in writing by the Artist.*"

- "The Company will provide reworked waxes of each rubber section *for the Artist's approval* prior to casting."

- "It is the intent of the parties that the Artist, FQC, and the Company establish a close and cooperative consultation during the duration of the project.... All parties acknowledge that in the enlargement process certain variations from the model will be required for *artistic*, technical or structural purposes. The Artist *or* FQC shall have the right to make adjustments ... in the design so long as the final piece shall be substantially the

same as the model and the 44″ sculpture as enlarged."

Compl. Ex. C at 3–9 (emphasis added). Reading these provisions in the light·most favorable to the plaintiff, as required on a motion to dismiss, *see Newman & Schwartz v. Asplundh Tree Expert Co.,* 102 F.3d 660, 663 (2d. Cir.1996), they support an inference that Flack was an intended third-party beneficiary of the Tallix–FQC Agreement. The inference is strengthened by the language in the Flack–FQC Agreement whereby Flack is obligated to "determine the form of artistic impression" of the Art Work. Compl. Ex. B at 2.

 Even if Flack is a third-party beneficiary of the Tallix–FQC agreement, however, she cannot prevail on her contract claims against Tallix unless she establishes that Tallix breached its obligations to her under that agreement. *See, e.g., ESI, Inc. v. Coastal Power Prod. Co.,* 995 F.Supp. 419, 432 (S.D.N.Y.1998). Tallix argues that because Tallix and FQC resolved any differences they may have had as to Tallix's performance under the Tallx–FQC Agreement, and memorialized the settlement in the Modified Agreement, Flack cannot establish that Tallix breached any obligation under the Tallix–FQC Agreement.

While Tallix and FQC modified their first agreement such that *FQC* could not claim a breach of that agreement by Tallix, that modification does not necessarily immunize Tallix from claims of breach brought by a third party beneficiary. Indeed, once a third party beneficiary accepts, adopts, or relies upon a contract, the contracting parties cannot modify that contract without the third-party beneficiary's consent. *See, e.g., Reproducta Co. v. Kellmark Corp.,* No. 92 CIV. 9362(MBM), 1994 WL 719705, at *3 (S.D.N.Y. Dec. 3, 1994); *Barnum v. Millbrook Care Ltd. Partner-*

*ship,* 850 F.Supp. 1227, 1236 (S.D.N.Y. 1994).

In this case, however, Flack does not argue, and the complaint pleads no facts to suggest, that she accepted, adopted, or relied upon the Tallix–FQC Agreement. Instead, she appears to have acted at all times pursuant to her rights and obligations pursuant to the Flack–FQC Agreement. Accordingly, FQC and Tallix were free to modify their agreement and, once the Modified Agreement extinguished any claims FQC might have for breach of the FQC–Tallix agreement, Flack's claims were extinguished as well. *See BAII Banking Corp. v. UPG, Inc.,* 985 F.2d 685, 697 (2d Cir.1993) (noting that claims by a third-party beneficiary are subject to the same defenses as are available against the promisee). Flack's breach of contract claims against Tallix are dismissed.

F. *The Claim that Tallix Tortiously Interfered with·the Flack–FQC Agreement*

 As noted above, Flack alleges that Tallix tortuously interfered with her contract with FQC by putting the clay model outdoors and by hiring David Simon. To prevail on that claim, Flack must establish: (1) the existence of a valid contract between Flack and FQC; (2) Tallix's knowledge of the contract; (3) Tallix's intentional inducement of FQC to breach the contract; and (4) damages. *See, e.g., Foster v. Churchill,* 87 N.Y.2d 744, 749–50, 642 N.Y.S.2d 583, 586, 665 N.E.2d 153, 156 (1996); *Kronos, Inc. v. AVX Corp.,* 81 N.Y.2d 90, 94, 595 N.Y.S.2d 931, 934, 612 N.E.2d 289, 292 (1993). To satisfy the third element, "the interference must be intentional and not incidental to some other lawful purpose." *Health–Chem Corp. v. Baker,* 915 F.2d 805, 809 (2d Cir.1990).

Flack, however, has failed to allege facts supporting intentional inducement. In-

deed, the complaint states that it was FQC that "encouraged" Tallix to hire David Simon, and that "FQC and Manuel A. Sousa"—not Tallix—"deliberately caused Ms. Flack to be excluded from the process of reconstructing the clay face of the 35' Statute." Compl. ¶¶ 39, 70, 79–80. Moreover, even if the complaint could be read to permit an inference that Tallix instigated the modification, there is no indication in the complaint that the modification was not incidental to the lawful purpose of Tallix's compliance with its own agreement with FQC. Flack's claim for tortious interference with contract is therefore dismissed.

### G. Flack's Motion for a Preliminary Injunction

■ This Court will grant a preliminary injunction only if a party demonstrates "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam).

Flack relies on cases stating that a showing of a violation of VARA or of copyright infringement creates a presumption of irreparable harm. *See English v. CFC&R East 11th Street LLC*, No. 97 Civ. 7446, 1997 WL 746444, at *3 (S.D.N.Y. Dec. 3, 1997) (VARA); *Tienshan v. C.C.A. Int'l*, 895 F.Supp. 651, 655 (S.D.N.Y.1995) (copyright). The presumption only applies, however, in regard to prospective violations of law. *See, e.g., English*, 1997 WL 746444, at *3 (prospective destruction of a sculpture garden); *Tienshan*, 895 F.Supp. at 659–60 (prospective distribution of infringing materials). In this case, Flack's surviving claims are solely for possible past violations of the Copyright Act and VARA, *i.e.*, the Simon modification.

Accordingly, Flack has failed to establish irreparable injury, and her motion for a preliminary injunction is denied.

### III. CONCLUSION

For the reasons set forth above, defendants' motions to dismiss are: (1) denied as to plaintiff's VARA and Copyright Claims related to the resculpting of the clay face by David Simon; (2) denied as to plaintiff's claims for breach of contract against FQC; and (3) in all other respects granted. Plaintiff's motion for leave to amend her complaint to add a copyright registration number is granted, and her motion for a preliminary injunction is denied.

SO ORDERED.